**UNITED STATES of America**

v.

**Virgil L. GRIFFIN, Edward Woodrow Dawson, David Wayne Matthews, Roland Wayne Wood, Jerry Paul Smith, Jack Wilson Fowler, Jr., Roy C. Toney, Coleman B. Pridmore, and Raeford Milano Caudle.**

**Crim. Nos. 83–53–01–G to 83–53–09–G.**

United States District Court,
M.D. North Carolina,
Greensboro Division.

Oct. 6, 1983.

On Proffer of Testimony April 3, 1984.

Fred R. Harwell, Thomas J. Keith, Jim D. Cooley, Roy G. Hall, Winston-Salem, N.C., Neill A. Jennings, Jr., Jeffrey P. Farran, Greensboro, N.C., S. Fraley Bost, Winston-Salem, N.C., Harold F. Greeson, Greensboro, N.C., Leon E. Porter, Jr., Winston-Salem, N.C., for defendants.

Daniel L. Bell, II, Norajean M. Flanagan, Gregory F. Linsin, Civil Rights Division, Criminal Section, U.S. Dept. of Justice, Washington, D.C., for United States.

## MEMORANDUM

FLANNERY, District Judge, Sitting by Designation.

This matter is before the court on defendants' motion to dismiss the indictment. Defendants argue that the indictment filed against them in this case fails to charge a violation of the laws of the United States. For the reasons set forth below, defendants' motion is denied.

*Discussion*

The indictment in this case alleges a conspiracy among nine defendants to commit offenses against the United States in violation of 18 U.S.C. § 245(b)(2)(B) and (b)(4)(A). The indictment alleges that the defendants

> conspired willfully to intimidate and to interfere with participants in an anti-Klan parade, and other persons, by force and threat of force, because the participants in the parade were taking part without discrimination on account of race in a privilege and activity, that is, a parade, authorized and administered by the City of Greensboro, a subdivision of the State of North Carolina, which conspiracy resulted in death and bodily injury to parade participants.

Indictment at 3. The indictment alleges that the defendants, members of the Ku Klux Klan and the National Socialist ("Nazi") Party of America, conspired to go to Greensboro, North Carolina on November 3, 1979, in order to heckle and disrupt the anti-Klan parade and to cause bodily injury to parade participants. Counts Two through Twelve of the indictment arise out of specific violent acts allegedly committed by the defendants in Greensboro. These Counts allege that the defendants wilfully injured and killed a number of parade participants. The government maintains that these acts violate specific provisions of 18 U.S.C. § 245. The defendants argue that the provisions invoked by the government do not prohibit the conduct set forth in the

indictment, and argue that if the statute does prohibit the conduct in question it is, nonetheless, unconstitutionally vague.

■ A. Defendants argue initially that any criminal conduct arising out of interference with a public parade must fall within 18 U.S.C. § 245(b)(5) (speech and assembly provision) and not § 245(b)(2)(B) and (b)(4)(A) (state programs and activities provision).[1] However, this court is not convinced that the "Kill the Klan" parade at issue here is within the subset of parades protected by § 245(b)(5). That section protects only speech or assembly "opposing the denial of the opportunity to ... participate" in any of the activities set forth in the statute. Thus the speech and assembly provision specifically addresses and protects parades in support of boycotts organized to fight racial discrimination, *Perkins v. Mississippi*, 455 F.2d 7 (5th Cir.1972), or parades in support of school desegregation, or parades organized to promote voter registration drives. However, the parade that took place in Greensboro did not seek to oppose any denial of the opportunity to participate in any activity set forth in the statute. Although the parade could be characterized generally as a "civil rights" parade, the parade was organized primarily to enable the participants to express their public contempt for a clandestine racist organization, the Ku Klux Klan. If the parade was intended to promote equal participation in the activities set forth in the statute, that purpose was clearly incidental to its cathartic purpose of expressing hatred of the Klan, and its educative purpose of informing local citizens of the Klan's presence in the community. Therefore, the anti-Klan parade is not the kind of "assembly" clearly contemplated by § 245(b)(5).

■ Defendants argue, however, that regardless of whether this parade is within § 245(b)(5), that speech and assembly provision of the statute provides the *exclusive* statutory protection for parades. This court does not agree with defendants' reading of the statute. The court does not agree that the broadly fashioned civil rights statute found at 18 U.S.C. § 245 was intended by Congress to protect only a narrow subset of parade activity. Although it seems plain that Congress was aware of the violence that accompanied particular kinds of civil rights assemblies, and wished to tailor one provision of the statute to address that violence, this court cannot presume that Congress intended to *limit* the scope of the statute to that type of assembly. This court cannot presume that Congress intended to exempt from the reach of 18 U.S.C. § 245 violent interference for racial or religious reasons with an ethnic street celebration, or a religious parade or procession. These parades, like the anti-Klan demonstration, do not fall neatly within the prescription of § 245(b)(5), but remain instances of assembly often accompanied by racially motivated violence. The importance of parades to ethnic and religious solidarity makes it appear unlikely to this court that Congress intended to exempt such parades from the statute's reach. Accordingly, this court finds that the government properly looked to 18 U.S.C. § 245(b)(2) in drafting this indictment. That section protects rights to ra-

1. The statute under which the defendants were indicted reads:

(b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

(2) any person because of his race, color, or national origin and because he is or has been—

(B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof;

⋅ ⋅ ⋅ ⋅ ⋅

(4) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—

(A) participating, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in [subparagraph (2)(B) above].

⋅ ⋅ ⋅ ⋅ ⋅

shall be fined not more than $1,000, or imprisoned not more than one year, or both, and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life.

cial justice generally, by prescribing violent interference with any "activity ... administered by any State or subdivision thereof." 18 U.S.C. § 245(b)(2)(B). The anti-Klan parade participants were protected from violent interference under this provision of the statute, and the government correctly invoked this provision rather than the narrow speech and assembly provision of § 245(b)(5).

B. Defendants argue that the government's reliance on the state activity provision of the statute is doubly flawed because the anti-Klan parade was neither an "activity" within the meaning of the statute, nor "administered" by the City of Greensboro. The statute protects persons from violent interference with their participation in "any benefit, service, privilege, program, facility or activity provided or administered by any State or Subdivision thereof." 18 U.S.C. § 245(b)(2)(B). Defendants argue that the parade is simply not an activity protected by the statute, and that the City of Greensboro did not provide or administer the parade.

■ This court disagrees. Although the City of Greensboro could not have prohibited the parade because of its message, the City had an affirmative responsibility to regulate the time, place and manner of the parade in order to ensure the public order. *See Cox v. Louisiana,* 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). The City required the Workers' Viewpoint Organization to apply for a parade permit, and to set forth the objectives, time, date, and proposed parade route of the parade. The parade permit set forth certain conditions on the parade, and prohibited the carrying of weapons by parade participants, and limited the size of posts supporting placards or signs. When the City Manager issued the parade permit, he qualified the permit with the language "the conduct of such parade shall be at all times subject to the supervision and control of the Police Department of the City of Greensboro." Defendants' Ex. C.

This court finds that the City of Greensboro took an active role in controlling and managing the parade. The Greensboro Code of Ordinances contains lengthy and highly specific requirements and regulations applicable to parades, and defines the responsibilities and functions of both parade participants and the City. The thorough involvement of the city in the details of the parade, and the city's close supervision and control of the march, qualifies this parade as having been "administered" by the city of Greensboro within the meaning of 18 U.S.C. § 245(b)(2)(B).

■ In addition, the court finds that the parade was an "activity" within the meaning of the statute. Defendants argue that the statute was intended to reach only violent interference with tangible *benefits* or *services* of the city, such as fire, police protection, public housing, schools, transportation, and other programs. This court rejects this interpretation of the statute. If Congress had intended the statute to be limited to state services, benefits or programs, Congress would not have added the more inclusive term "activity". The inclusion of this term expresses Congress' intent to encompass state administered activities within the protection of the statute. Such activities encompass events too transient in nature, and too ephemeral to be designated services or programs. Such activities quite reasonably include state regulated parades.

Nor does the legislative history to the Act contradict the plain language of the statute. The Act has a broad remedial purpose. As stated in the House Report to the Act, "The Bill is intended to strengthen the Government's capability to meet the problem of civil rights violence." H.R.Rep. 473, 90th Cong., 1st Sess. 3 (1967). The Senate Report likewise explained Title I as a measure "to meet the problem of violent interference, for racial or other discriminatory reasons, with a person's free exercise of civil rights." S.Rep. No. 721, 90th Cong., 1st Sess. 3 (1967), U.S.Code Cong. & Admin.News 1968, pp. 1837; 1838. The Senate Report points out that the areas of protected activity are specifically described and include "participating in or enjoying

the benefits of services, programs, facilities, or activities of Federal state, or local governments." *Id.* at 3, U.S.Code Cong. & Admin.News 1968, p. 1838. The court finds that the attack on the parade participants by the Ku Klux Klan epitomizes the type of violence sought to be addressed by this statute, and that the indictment was properly founded on 18 U.S.C. § 245(b)(2)(B) and (b)(4)(A).[2]

 C. Defendants also argue that the indictment must be dismissed because the statute underlying the indictment is unconstitutionally vague, and fails to describe the prohibited conduct with the requisite specificity and precision. As a matter of due process, a law is void if it is so vague that persons of "common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). This indefiniteness presents problems because persons may not be given fair notice of what to avoid, and law enforcement officials may enforce the law arbitrarily.

However, vagueness and inclusiveness are at odds. A legislature is faced with the

---

**2.** A short catalog of the kinds of violent acts that gave rise to the statute was provided by Senator Javits during Senate debate on the Act. The Act was intended to provide a federal remedy for victims of racially motivated violence, and the variety of acts catalogued by Senator Javits provides an insight into the intended scope of the Act.

On April 23, 1963, at Kenner, Ala. W.L. Moore, a Baltimore postman, was slain while walking along an interstate highway with a sign espousing racial equality. No State or Federal trial resulted from this killing.

On June 23, 1963, at Jackson, Miss., Medgar Evers, State director of the National Association for the Advancement of Colored People, was shot from ambush. Two State trials resulted in hung juries. No Federal indictment was requested on the ground that there was no Federal law to cover the situation. So far no one has been punished for that murder.

On September 15, 1963, in Birmingham, Ala., four little Negro girls, in an incident which literally shocked the country to the roots of its conscience, were killed in a church bombing. No State or Federal prosecution resulted.

On June 21, 1964, in Neshoba County, Miss., three civil rights workers were killed. We are well aware of this incident, it received enormous publicity. Michael Schwerner, Andrew Goodman, and James Chaney are names which will go down in American history. No indictments were returned in the State. Federal felony indictments were dismissed, then reinstated by order of the Supreme Court, and the result, 18 indicted, eight acquitted, seven convicted, and three the subject of hung juries.

On June 11, 1964, in Colbert, Ga., Col. Lemuel Penn, a Negro Army officer, traveling in a car on an interstate highway, was killed, just at random. The best that could be ascertained, as a result of the trial, was that the killing was intended to frighten local Negroes from asserting their rights under the new 1964 act. Said trial resulted in acquittal, a critically important factor in this matter, considering what subsequently ensured. Federal felony indictments were dismissed. Nonetheless, the Federal felony indictments were finally sustained, the case was tried, and two Klansmen, Cecil William Meyers and Joseph Howard Sims, were convicted. That conviction was affirmed by the fifth circuit court of appeals and a petition for certiorari is now pending before the Supreme Court.

March 8, 1965, in Selma, Ala., the Reverend James Reeb was beaten to death. The accused was acquitted in State court and no Federal prosecution was undertaken.

March 25, 1965, Lowndes County, Ala., the famous Liuzzo case: Mrs. Viola Liuzzo, a civil rights worker, was killed on an interstate highway after the march on Selma. In the State trial, a Klansman was acquitted, but a conviction on Federal charges was obtained and affirmed.

On August 20, 1965, again in Lowndes County, Ala., a deputy sheriff killed a divinity student, Jonathan Daniel, and critically wounded a priest. There was an acquittal in the State trial and no Federal prosecution.

Mr. President, some will say, "Well, these are matters of relatively ancient history, and has not the civil rights problem, especially the problem of lawlessness and injustice in the South moved beyond the point where this law is necessary?" Let us take a look at that.

In February 1967, Orliss Jackson, a leading NAACP figure in Adams County, Miss., was murdered. He had recently been promoted in his job at the Armstrong rubber plant and apparently because of this, he was a victim of murder only last year.

On March 12, 1967, three Headstart buildings were bombed, two in Lowndes County, Ala.—which recurs repeatedly through this very tragic history—and one in Liberty County, Miss.

114 *Cong.Rec.* S533–534 (daily ed. Jan. 22, 1968) (statement of Senator Javits).

dilemma of drafting with sufficient generality as to reach all prescribed conduct, yet draft with sufficient particularity so as not to ensnare the innocent. The court finds that the statute, and the specific provision in question, provides a set of reasonably clear guidelines for both wrongdoers and law enforcement officials. The statute punishes violent interference with certain enumerated activities. The statutory standard is not so vague that a would-be law abiding citizen of common intelligence can look at the statute and be unable to discern the kind of conduct he is supposed to avoid.

Moreover, this statute has a scienter requirement. Section 245 requires that the accused act wilfully and with a specific intent to do what the law forbids. To constitute a violation of the statute, the government need not show that an offender knew of the exact nature of the federal character of the right infringed, but the government must show that the offender wilfully sought to interfere with the enumerated activity. *See United States v. Griffin*, 525 F.2d 710, 712–13 (1st Cir.1975), *cert. denied*, 424 U.S. 945, 96 S.Ct. 1414, 47 L.Ed.2d 351 (1975). The indictment alleges that the defendants were aware that the participants were participating in a parade permitted by the City, and that the defendants thereafter sought to interfere violently with such participation. The defendants were at no time forced to speculate about the nature of their conduct, or the fact that it was unlawful.

An appropriate Order accompanies this Memorandum.

## ORDER

This matter came before the court on defendants' motion to dismiss indictment. After reviewing the defendants' motion, and the opposition thereto, and after hearing oral argument directed at this motion, it is, by the court, this 6th day of October, 1983,

ORDERED that defendants' motion to dismiss the indictment is denied.

## On Proffer of Testimony

This matter comes before the Court on the defendants' proffer of testimony of Thomas Osborne, City Manager of Greensboro. The proffer indicates that Mr. Osborne would give testimony allegedly relevant to the issue of whether the "Death to the Klan" parade was "administered" by the City of Greensboro. The question facing the Court is whether Mr. Osborne's testimony would be relevant to any issue of fact involved in this case. Because the Court believes it would not, it will not admit Mr. Osborne's testimony as set forth in defendants' proffer.

## BACKGROUND

The event around which this case revolves is a "Death to the Klan" parade held in Greensboro, North Carolina on November 3, 1979. The issue of whether this parade is within the purview of this statute is one that this Court has previously addressed. In a Memorandum dated October 6, 1983, this Court found that the parade at issue in the present case was an "activity" within the meaning of 18 U.S.C. § 245(b)(2)(B), and would be "administered" by the City of Greensboro if a permit was issued, as alleged by the Indictment. The question at hand is, to what extent, if any, should the *Court* interpret the word "administered" as it appears in the statute, and to what extent should the Court base its jury instruction and rulings on the relevancy of evidence on its interpretation. Defendants allege that the meaning of "administered" is an open question upon which wide ranging evidence should be adduced at trial. The government asserts that the only factual question that the jury must decide, on this issue, is whether the City of Greensboro issued a parade permit for this parade. If the City issued a permit, argues the government, then as a matter of law the parade was "administered" by the City, and Mr. Osborne's testimony as proffered is irrelevant.

## DISCUSSION

The parties and the Court agree that the Court cannot direct a verdict of guilty no

matter how strong the evidence. It is further agreed that an instruction that decides a material factual question, as a matter of law, adversely to the accused is tantamount to a partial directed verdict of guilty. *See e.g., Mims v. United States*, 375 F.2d 135, 148 (5th Cir.1967). It is also beyond question, however, that courts are empowered to interpret statutes and must often utilize those interpretations in instructing the jury. This maxim seems particularly applicable when the issue in question is jurisdictional. *See, e.g., United States v. Kuta*, 518 F.2d 947, 951 (7th Cir.), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975) (interstate commerce); *United States v. Briddle*, 443 F.2d 443, 447 (8th Cir.), *cert. denied*, 404 U.S. 942, 92 S.Ct. 291, 30 L.Ed.2d 256 (1971) (United States' property).

The rationale behind this policy was enunciated in *United States v. Hyde*, 448 F.2d 815, 842 (5th Cir.1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972), in which the court decided the question of what activities affected interstate commerce. The court explained that the facts alleged met the statutory requirement of affecting interstate commerce, and went on to instruct the jury that if they believed those facts then they should find that interstate commerce had been affected. The court stated:

> This approach is used rather than telling the jury in general terms what it means to affect commerce and allowing the jury to determine whether the facts meet this criterion, because this is a jurisdictional element for which the court has a great responsibility.

*Id.* at 839.

The case at bar is analogous, as such situations are not limited to those involving interstate commerce. In *United States v. Briddle*, although the statute required a finding that the defendant damaged "property of the United States" the court instructed the jury that the property in question was, as a matter of law, "property of the United States." 443 F.2d at 447. In that case, the court left nothing for the jury to decide with regard to that element of the case. Similarly, in *United States v. Guy*, 456 F.2d 1157, 1163 (8th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 136, 34 L.Ed.2d 153 (1972), the court refused to submit the question of whether Federal Reserve notes are obligations of the United States. The trial court found that this was an issue of law, and, in the words of the Court of Appeals, "properly excluded evidence on this issue when it was brought up, time and again, at trial." *Id.*

The question at hand is jurisdictional in nature. The defendants point out that § 245 is entitled "Federally Protected Activities," and it is clear that unless such an activity is involved, there could be no violation of this act. Indeed, Congress would be powerless to act on, and this Court would lack jurisdiction over, a *"non*-federally protected activity." Therefore, the issue of whether this parade was a protected activity, *i.e.*, was administered by the City of Greensboro, is similar to the issue in *Kuta* and *Hyde*, *supra*. As in those cases, the jurisdictional question of law in the case at bar must be decided by the Court and not the jury.

An examination of the statute itself and its legislative history leads to the same conclusions. The term "administered" as used in 18 U.S.C. § 245(b)(2)(B) cannot be separated from the surrounding sections of the act. Those sections enumerate the categories of activities to which the protections of this law attach. The debate over the coverage of the bill was extensive and makes it clear that Congress painted with a broad brush in this area. Sponsors and opponents of the bill both agreed that the protection of the act was extremely broad. After listing *some* of the protected activities that appear in the statute, including those contained in § 245(b)(2)(B), Senator Ervin stated: "That covers about everything except a private home; and it might cover a private home if it were built under a mortgage guaranteed by the Federal Housing Administration." 114 Cong.Rec. 386 (1968). The question at bar was addressed by Senator Holland when he stat-

ed: "It is very clear to me that when people demonstrate under subsection (3) [§ 245(b)(2)(B) ] or (7) of section A, they are certainly to be brought under the law." *Id.* at 333.

The above statements are by no means isolated in the legislative history of this statute. Quite to the contrary, the record is replete with statements noting the breadth of the statute.[1] Congress intended to cover a wide range of activities and enunciated this intent clearly through its list in § 245(b)(2). The purpose of making the broad coverage of the statute clear was to "avoid unnecessary litigation concerning coverage and ... provide unmistakable warning to lawless elements not to interfere with any of these activities." S.Rep. No. 721, 90th Cong. 1st Sess., 6 (1967), U.S.Code Cong. & Admin.News 1968, p. 1841.

This intent would be thwarted if the jury were allowed to deduce its own interpretation of "administered" based, in part, on Mr. Osborne's testimony. Whether a budget entry appeared for the Death to the Klan parade, or how many police officers were assigned to the parade, are questions which do not bear on whether the parade was administered by the City of Greensboro, as that word appears in the statute. Neither is Mr. Osborne entitled to give his legal opinion on what the word "administered" means as used in this statute. Racially motivated violence during parades, marches, and demonstrations was precisely what this act was designed to redress. To allow juries, on a case-by-case basis, to determine in a vacuum whether a certain activity is covered by the act would thwart Congress' intent in enacting this legislation, as well as the general policy that the will of the legislature should be uniformly applied. *See Sparf v. United States,* 156 U.S. 51, 71, 15 U.S. 273, 281, 39 L.Ed. 343 (1895).

The only way to ensure that these policies are abided by in this context is for the Court to decide the coverage of the statute and for the jury to apply the facts to this legal finding. The relevant *factual* questions involved are whether the City of Greensboro issued a permit for this parade, and whether the police planned at least to routinely monitor the parade. This Court finds, for the reasons stated above and in its Memorandum of October 6, that a parade for which a permit is issued by a city, and for which routine monitoring by the police was planned, is an activity "administered" by that city. Therefore, any evidence not pertaining to these two questions on what "administered" means, under the statute, is irrelevant to any question of law.

It would be anomalous to submit this issue to the jury in the broad form defendants' request. It is Congress' task to write the law, the court's to interpret the law, and the jury's to find facts and apply them to the law. If this Court were to leave to the jury or to any witness the question of what "administered" means in the context of this act, it would be abdicating its duty to interpret the statute. The Court is not deciding whether the parade in the present case was "administered" by the City of Greensboro. That determination is left for the jury. This Court is merely carrying out its duty to tell the jury what "administered" means in the context of this statute, and is restricting the presentation of evidence to testimony that is relevant to the issues that will face the jury.

---

1. One of the sponsors of the bill in the Senate, Senator Hart, stated clearly that this act was designed to protect someone travelling on an interstate highway. 113 *Cong.Rec.* 547 (1968). For further discussion of the broad scope of the section, *see also id.* at 533–36 (comments of Sen. Javits); *id.* at 924 (comments of Sen. Sparkman); *id.* at 1029 (comments of Sen. Eastland); *id.* at 5226 (comments of Sen. Ervin).