**UNITED STATES of America**

v.

**Ricky Lynn CREEKMORE.**

**No. CR–84–AR–104–NE.**

United States District Court,
N.D. Alabama.

Nov. 26, 1986.

Donald L. Colee, Jr., Birmingham, Ala. (Court-appointed), for Creekmore.

Bill L. Barnett, Birmingham, Ala., Craig Shaffer and Barbara Kammerman, U.S. Dept. of Justice, Washington, D.C., for U.S.

## MEMORANDUM OPINION

ACKER, District Judge.

On November 13, 1986, Ricky Lynn Creekmore was found guilty of conspiring to violate the following provisions of 18 U.S.C. § 245:

(b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

\* \* \* \* \* \*

(2) any person because of his race, color, religion, or national origin *and* because he is or has been—

\* \* \* \* \* \*

(B) participating in or enjoying any benefit, service, *privilege*, program, facility *or activity provided or administered by any State or subdivision thereof.*

\* \* \* \* \* \*

shall be fined not more than $1,000 or imprisoned not more than one year, or both.

(emphasis supplied).

Creekmore has filed a post-trial motion for judgment of acquittal pursuant to Rule 29(c), F.R.Cr.P., asserting that the United States failed in its burden of proving one of the essential elements of the crime charged in the indictment and required by this statute. The pertinent language in the indictment reads:

... they conspired willfully to intimidate and to interfere with, by force or threat of force, participants in a public parade, because of the race and color of those parade participants and because the participants in the parade were taking part in a privilege and activity, that is, a public parade, provided and administered by the City of Decatur, a subdivision of the State of Alabama....

In pre-trial motions all nine alleged co-conspirators requested dismissal of the indictment, contending that the parade which was staged by the Southern Christian Leadership Conference on May 26, 1979, in Decatur, Alabama, was not a "privilege" or "activity" within the meaning of those terms in the statute and was neither "provided by" nor "administered by" the City of Decatur within the meaning of those terms in the statute. On July 14, 1986, in *United States v. Handley*, 644 F.Supp. 1165 (N.D.Ala.1986), this court predicted that this parade would constitute an "activity" which would come within the ambit of § 245(b)(2)(B). This prediction has come true. A discussion of the alternative word "privilege" was then and is now unnecessary to the decision. The court judicially knows that the City of Decatur is a municipality and therefore a subdivision of the State of Alabama. Although prior to the order of July 14, 1986, the United States submitted a "proffer" of its expected evidence on the issue of whether or not this "activity" was "provided by" or "administered by" Decatur[1], the court at that time

**1. GOVERNMENT'S PROFFER OF EVIDENCE ON THE JURISDICTIONAL ISSUE**

In 1978–1979 prior to the SCLC march in question, the City of Decatur enacted a series of ordinances which expanded the authority of the police to control public demonstrations. One city regulation prohibited loitering by groups which obstructed a public street or impeded the free passage of vehicles or pedestrians. Decatur Code, § 19–40. Another ordinance placed restrictions on the possession of firearms while attending or participating in a demonstration in a public place. Decatur Code, § 19–86. Still another law passed at that same time provided greater authority to the police to regulate, and even prohibit, public demonstrations where the public peace is being threatened. No parade permit requirement was in effect in the City of Decatur at the time of the march. Thus, there was no parade permit for this SCLC march.

During the week prior to the May 26th parade, organizers of the march met with Decatur Police Chief, Pac Self, to advise the City of the planned march and to discuss details concerning the time, route, and destination of the march, the number and ages of anticipated participants, the number and kinds of vehicles to be used during the event, and the presence of any flags, banners or animals in the procession. Based upon the information provided at that meeting, Police Chief Self indicated the City's approval for the march by saying that the City would provide the best protection possible.

During the week preceding May 26, 1979, Chief Self contacted Captain Gamel of the Alabama State Troopers, advising him of the upcoming march and of the need for trooper backup during the march. Based upon Chief Self's request, Captain Gamel placed a number of his troopers on call for the 26th. In addition, Alabama State Troopers underwent additional training in riot control procedures. On the morning of May 26, 1979, Chief Self requested additional manpower from the Alabama State Troopers and Morgan County Sheriff's Department. Thereafter, Morgan County deputy sheriffs and Alabama State Troopers were dispatched to Lee and Bank Streets in response to Chief Self's request.

On the morning of May 26, 1979, in anticipation of the march, the Decatur Police Department's morning shift was reinforced by holding

could not know for sure what evidence the United States would actually present at trial. For good reason the parties would not stipulate to all facts which might bear on the issue. The court, therefore, denied defendants' said motions to dismiss but opined that if the facts were as anticipated by defendants "it may portend badly for the United States." 644 F.Supp. at 1177.

The court has now heard the oral testimony and has read and viewed the exhibits actually offered by the Government during the trial of Creekmore, and finds that the Government did, as was predicted, fail to meet its burden of proving beyond a reasonable doubt that the SCLC parade was "provided by" or "administered by" the City. The basic facts were as defendants had said they would be. 644 F.Supp. at 1177. Some of the evidence, but certainly not all of the evidence, as "proffered" by the United States and set forth in footnote 1, was actually offered at trial. Material facts in the "proffer" were never offered at trial.

On May 26, 1979, not only did Decatur not have an ordinance requiring that a parade permit must be applied for and granted before marchers could use the public streets, but the three ordinances which were introduced by the Government, taken singularly and in the aggregate, do not provide any legislative mandate by the City for the "providing of" or for the "administering of" any parade or public demonstration. Ordinance No. 2167, enacted on February 19, 1979, perhaps in anticipation of the kind of trouble which erupted on May 26, 1979, when the Klan and the SCLC clashed and when persons on both sides received gunshot wounds, made it "unlawful for any person other than a law en-

forcement officer to have in his possession or on his person while participating in or attending any demonstration ... any firearm." By no stretch of language can this ordinance, or either of the other two ordinances which were received, be construed "to provide" for a parade or "to administer" a parade. Greensboro's actual requirement of and the issuance of the parade permit were the controlling facts in *United States v. Griffin*, 585 F.Supp. 1439 (M.D.N.C.1983, 1984). The court will not repeat its earlier commentaries on *United States v. Griffin*. The court simply reaffirms them here.

Now that all of the evidence is in against one of the defendants, the United States still insists that this particular SCLC parade was both "provided by" and "administered by" the City. Its brief, however, limits itself to arguing for the proposition that this parade was "administered by" the City. The court therefore concludes that the United States cannot be serious in its contention that the parade was "provided by" the City. The Government's "administered by" argument is weak. Its "provided by" argument is non-existent. Webster tells us clearly that to "provide" means to "furnish" or to "supply," or to "make available." Inherent in the verb "provide" is the concept that the "provider" act not as some sort of auxiliary or monitor of the item being "provided" but that he actually create or initiate the thing being "provided."

Judge Flannery, in *United States v. Griffin*, appropriately spent his time wrestling with the phrase "administered by." He gave no attention to the phrase "provided by." This leaves the Government in Creekmore's case with the slender reed

---

over officers from the preceding night shift and by calling in early officers assigned to the afternoon shift. That morning Decatur police officers were issued riot equipment and given specific assignments in connection with the parade. Detectives were assigned to monitor the activity of assembled klansmen, and uniformed officers were instructed to monitor the progress of the black marchers. A contingent of officers was stationed at Lee and Bank Streets in response to klansmen assembling at that location.

As the parade approached the intersection of Lee and Bank Streets, klansmen entered the street effectively blocking the passage of the marchers. In response, police officers and deputy sheriffs were ordered to clear the klansmen from the street to allow the march to continue. Police officers entered the street and ordered klansmen to leave the street. Thereafter police officers were attacked by klansmen who refused to obey those orders and instead persisted in advancing toward the black marchers.

**1372**

"administered by." Webster defines "administer," in the only context in which the word could here be applicable: *"to have charge of as chief agent in managing, as public affairs; conduct; direct."* *Webster's Deluxe Unabridged Dictionary,* 26 (2d Ed.1983). (emphasis supplied). The same meanings of the word "administer" are acknowledged in *Black's Law Dictionary,* as well as in the cases cited in *Words and Phrases.* Under the word "administer" *Words and Phrases* includes the following comment on *United States v. Griffin* as its most recent source for understanding the meaning of the word "administer:"

> Where city had *affirmative responsibility* to regulate time, place and manner of parade in order to insure public order, *and had required organizing committee to apply for parade permit, to set forth objectives, time, date and proposed parade, and permit set forth certain conditions for parade,* city's close supervision and control of parade qualified parade as having been 'administered' by city within meaning of state programs' provision of statute governing federally protected activities.

2 *Words and Phrases* (Supp.1986) (citing *United States v. Griffin,* 585 F.Supp. 1439, 1442 (M.D.N.C.1983, 1984)) (emphasis supplied).

Not only was there no parade permit required or issued by Decatur, but there was no pattern or practice for seeking or obtaining the City's permission, formal or informal, for conducting a parade or a public demonstration. These "activities" obviously were considered by Decatur simply as lawful exercises of the freedoms of speech and assembly, not requiring prior approval or the imposition of particular conditions such as time, place, route, etc. Not only did Decatur not have "charge over" or "manage" this particular parade, but the testimony of the Government's very first witness, Sergeant Collier, a Decatur police officer, was that although he was in charge of monitoring and protecting the SCLC marchers, he was unaware of any prearranged parade route, although everyone could pretty well guess the route, and that when he asked Reverend Cottonreader, the SCLC leader, the intended route of the parade, Reverend Cottonreader refused to give it. Does this sound like the City played the role of decision maker? Surely not. An "administrator" is a decision maker, a leader. Another Government witness, Reverend Turner, testified that Sheriff Ward (who, incidentally, was not employed by the City but by Morgan County, a State subdivision which the Government expressly denies "administered" this parade) asked the SCLC to delay the start of its march. This testimony was not only undisputed but was confirmed by another SCLC witness who was put on the stand by the Government. She testified that Reverend Cottonreader made it stridently plain to the police that the SCLC would march *when and as it planned* and not in accordance with any suggestion made by municipal or county authorities.

Pac Self, Decatur's police chief in May 26, 1979, was unavailable at trial because he died before the long-delayed indictment. The Government carefully elicited from Reverend Turner as much as it could in the way of conversations between Reverend Turner and Chief Self prior to the parade. The Government obviously was trying to track as many of the factors outlined in *United States v. Griffin* as it could. Even without the possibility of Creekmore's obtaining any contradictory testimony from Chief Self, the Government failed to establish a sufficient similarity between Greensboro's degree of participation in and control over the Greensboro march and Decatur's degree of participation in and control over the Decatur march to turn *United States v. Griffin* into a persuasive precedent. Reverend Turner admitted that Chief Self never sat down with him and mapped a parade route. He admitted that no policeman ever blocked off cross streets to facilitate the parade, a technique which would normally be expected for a "permitted" or a municipally planned and managed parade.

The Government argues that § 245 should be liberally construed in order to accomplish its "purpose." The Government refers to legislative history. While this court does not read the legislative history to indicate any Congressional intent to give the word "administer" some new or esoteric meaning, this court believes that if all one hundred United States Senators unanimously stated on the floor of the Senate their intent, a subsequent contrary enactment as signed by the President would not alter the English language to conform to the so-called "intent" unless the Congress expressly willed the semantic alteration by the device of inserting "definitions" to give particular words new meanings.

There are at least two cardinal rules of statutory construction in play here. The first is well articulated in *Ex parte Collett*, 337 U.S. 55, 69 S.Ct. 944, 93 L.Ed. 1207 (1949), as follows:

> Petitioner's chief argument proceeds not from one side or the other of the literal boundaries of § 1404(a), but from its legislative history. The short answer is that there is no need to refer to the legislative history where the statutory language is clear. 'The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction.' *Gemsco v. Walling*, 324 U.S. 244, 260 [65 S.Ct. 605, 614, 89 L.Ed. 921] (1945). *This canon of construction has received consistent adherence in our decisions.*

337 U.S. at 61, 69 S.Ct. at 947. (emphasis supplied).

See also *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978); *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 105 S.Ct. 638, 645, 83 L.Ed.2d 556 (1985).

The second pertinent rule of construction is well stated in *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), as follows:

> ... this being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity.

93 S.Ct. at 1015.

When this principle was enunciated by the Supreme Court, it became the law of the Eleventh Circuit, but the Eleventh Circuit also inherited the same principle from the Fifth Circuit in *United States v. Bridges*, 493 F.2d 918 (5th Cir.1974), in which the Fifth Circuit said:

> Our analysis of the issue in this case is completed by referring to the familiar principle of statutory construction 'that criminal statutes must be strictly construed, to avoid ensnaring behavior that is not clearly proscribed.' *Simpson v. Simpson*, 490 F.2d 803, 809 (5th Cir. 1974).

493 F.2d at 922.

If Creekmore had sought legal advice prior to his attendance at the Klan's counter-demonstration which led to the violent confrontation on May 26, 1979, and if his lawyer had known all of the facts bearing on whether or not the SCLC parade would be "administered by" the City of Decatur, and if the lawyer knew the rules of statutory construction, the lawyer would in all probability have advised Creekmore that there was a possibility that he and his fellow Klansmen would violate City ordinances or State laws, but he would *not* have advised Creekmore of a potential violation of 18 U.S.C. § 245(b)(2)(B).

Either Webster controls and the statutory language leaves no doubt as to its meaning, or there is sufficient ambiguity to trigger the presumption of a construction in favor of the accused.

The court finds it both interesting and revealing that, during the Creekmore trial, counsel for the United States explained that the reason the Department of Justice delayed for five years before indicting Creekmore was that it never occurred to the Department to try to make out a case against Klan members as a result of the Decatur incident under 18 U.S.C. § 245 until after the Greensboro convictions. In other words, a statute which was enacted

in 1968, and which always had the legislative history now urged upon this court, and which was on the books on May 26, 1979, was not noticed by the Department as a statutory basis for indicting Creekmore until years after the Decatur event. One would think that a statute as obvious as the Department of Justice now urges § 245(b)(2)(B) to be would have been recognized for its prosecutional potential by smart, well trained, eager lawyers shortly after the incident. While *United States v. Griffin* might have justified a re-evaluation of federal criminal responsibility for the Decatur event, the only explanation for the long delay is that for five years no lawyer in the Criminal Division of the Civil Rights Section recognized § 245(b)(2)(B) as a possible vehicle for prosecuting the Decatur Klansmen. While this court does not disagree with Judge Flannery's opinion in *United States v. Griffin,* this court does believe that Judge Flannery went just about as far as he could go with § 245 to make it into a viable vehicle for prosecuting persons who interrupt public parades.

A lesser used but useful tool of construction is to look at where a particular statutory interpretation, if adopted, would lead, and to avoid an interpretation which would lead to a ridiculous result. If the Government's interpretation of the words "administered by" were adopted by this court, a person who interferes with religious protesters picketing a department store because the store allegedly discriminates against members of the picketing group (that is, if the pickets were under the watchful eye of the local police) would be guilty of violating 18 U.S.C. § 245(b)(2)(B). It must be kept in mind that the police *in all instances* are charged with the duty of keeping the peace and of protecting persons and property. This is not a duty unique to parades and demonstrations. If a police presence requested by persons engaged in some activity automatically turns that activity into one "administered by" the governmental entity which supplies the police presence, then a bank which asks for police surveillance in anticipation of a possible bank robbery would constitute an activity "administered by" the municipality. Using such a rationale, if the police stake out at the bank the bank automatically becomes "administered by" the city. The Government's "logic" is illogical. For a city simply to provide police protection when needed by an enterprise, which is both planned and executed by a citizen group, does not and cannot mean that the enterprise is "administered by" the city. If such an inevitable linkage or *non sequitur* is ever judicially established, not only will Mr. Webster turn over in his grave but Messrs. Funk and Wagnalls will not rest easy.

Realizing that a good place to find legislative intent is in the legislation itself, the court notes the following language from 18 U.S.C. § 245(a)(1):

Nothing in this section shall be construed as indicating an intent on the part of Congress to prevent any State, any possession or Commonwealth of the United States, or the District of Columbia, from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section, nor shall anything in this section be construed as depriving State and local law enforcement authorities of responsibility for prosecuting acts that may be violations of this section and that are violations of State and local law.

This language is reminiscent of the following expression from *United States v. Emmons, supra:*

Neither the language of the Hobbs Act nor its legislative history can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or *such an unprecedented incursion into the criminal jurisdiction of the States.*

93 S.Ct. at 1015 (emphasis supplied).

The Congress did not intend to preempt the field of parade law and to substitute federal law enforcement for the routine enforcement of municipal ordinances and state criminal statutes proscribing assault, loitering, breaches of the peace, etc. Congress

had in mind a limited set of circumstances which would justify federal criminal action for the violation of rights being exercised by certain groups under State governmental auspices. Congress chose language which is understandable to this court and which can be understood by the average citizen, whether or not the average citizen has any inclination to conspire to interfere with an SCLC or with a Klan parade.

During oral argument the United States argued that a parade permit is not the *sine qua non* to a violation of § 245(b)(2)(B). In its brief filed on October 31, 1985, the United States argued that "the absence of that piece of paper [the parade permit] is not dispositive on the issue of jurisdiction where the parties acted so as to achieve the functional equivalent of a parade permit." When the Government prosecuted those who interfered with the Greensboro parade, it held high the parade permit as the piece of evidence most crucial to its case. "Consistency" is not necessarily synonymous with "prosecution."

If the evidence presented by the United States against Creekmore could be said to have removed all reasonable doubt about this particular parade having been the "functional equivalent of a parade conducted pursuant to a parade permit", this court might agree with the United States, but this court warned the United States before it submitted this case to the jury that the court did not believe that the United States had met its burden on the essential element that the parade was "administered by" the City of Decatur. Instead of heeding the court's admonition, the Government now argues that it only wants the court to take *United States v. Griffin* one small step further. The truth is that the Government is asking this court to push § 245(b)(2)(B) into another dimension.

The court wishes to make it clear that its decision in granting Creekmore's motion for judgment of acquittal does not involve a weighing of conflicting evidence or assessing the credibility of witnesses as was correctly criticized in *United States v. Burns*, 597 F.2d 939 (5th Cir.1979). The court has viewed the evidence on the single dispositive issue in the light most favorable to the Government. The court is assuming the truth of everything which Reverend Turner said about his conversations with Chief Self, conversations received into evidence over hearsay objections because the court deemed them to be relevant verbal acts.

Judges are not engaged in a popularity contest. If they were, this job would be an easier one. Not many people in this country are fond of the Ku Klux Klan, and for good reason. Nevertheless, this court now applies the same rules of statutory construction, as it already has the rules against self-incrimination, to a Klansman as it applies them to bootleggers, corrupt public officials, cocaine dealers and bank robbers.

An appropriate separate order will be entered.