**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-12792
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

WILLIAM BRYAN,
   a.k.a. Roddie,
GREGORY MCMICHAEL,
TRAVIS MCMICHAEL,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:21-cr-00022-LGW-BWC-3
_____

2                    Opinion of the Court                22-12792

Before BRANCH, GRANT, Circuit Judges, and CALVERT,* District Judge.

BRANCH, Circuit Judge:

This appeal arises from the federal convictions of Travis McMichael, Gregory McMichael, and William Bryan for their involvement in the tragic shooting death of Ahmaud Arbery. In Georgia state court, defendants were convicted of murder and other charges and given life sentences.[1] Following their state trial, they were tried and convicted in federal court of interference with rights, in violation of 18 U.S.C. § 245(b)(2)(B), and attempted kidnapping, in violation of 18 U.S.C. § 1201(a)(1). They now appeal those federal convictions.[2] Defendants do not raise any constitutional challenges on appeal; instead, they ask us to overturn their convictions on various evidentiary grounds. But because sufficient evidence supported their convictions, defendants' objections fail. Accordingly, after careful review and with the benefit of oral argument, we affirm.

---

* Honorable Victoria Calvert, United States District Judge for the Northern District of Georgia, sitting by designation.

[1] *See Georgia v. McMichael, et al.*, No. CR-2000433 (Glynn County Superior Court).

[2] Additionally, Travis and Gregory were tried and convicted of using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), but they challenge those convictions only insofar as they dispute that they committed a crime of violence (the interference with rights charge under 18 U.S.C. § 245(b)(2)(B)).

## I.    Background

Over the course of defendants' six-day trial, evidence was presented regarding (A) the events of February 23, 2020, culminating in the fatal shooting of Arbery; (B) the criminal and suspicious activity before February 23, 2020, in the Glynn County, Georgia neighborhood of Satilla Shores where the shooting occurred, which defendants claimed justified their pursuit of Arbery; (C) previous racially charged comments made by each defendant; (D) whether the streets of Satilla Shores were public; and (E) whether Travis's truck was an instrumentality of interstate commerce.  The evidence will be summarized in turn.

*A. The events of February 23, 2020*

Midday on Sunday, February 23, 2020, Arbery, a black male, went for a run through Satilla Shores, a non-gated neighborhood. During his run, he stopped at a construction site in the neighborhood—a house that had framing up, but did not have doors, interior walls, or signs telling people to stay away.  Arbery had stopped there before—over the previous four months, Arbery was spotted three other times on a surveillance camera walking around at the construction site and inside the vacant home.[3]  On

[3] Arbery was first spotted on the property on October 25, 2019.  The owner of the property, Larry English, called the police department.  A dispatcher was sent, but no one was found at the scene.  English again spotted Arbery on his property on November 18, 2019; he sent the videos to the police, but by the time the dispatched officer arrived, Arbery was gone.  And on February 11, 2020, Travis McMichael spotted Arbery on English's property.  Travis called

this particular February afternoon, a neighbor spotted Arbery. The neighbor thought Arbery walking around the construction site "seemed suspicious," and called the non-emergency police line to make a report.

While the neighbor was on the phone, Arbery left the construction site of the house and resumed running deeper into the neighborhood. He eventually ran past the McMichaels' house, where Gregory and his son Travis, both white males, lived together. Gregory, a 64-year-old retired law enforcement officer, was working in his front yard when Arbery ran past. Gregory had previously been shown the surveillance footage of Arbery in the construction area in the preceding months, so Gregory immediately recognized Arbery. Also suspecting Arbery of some recent burglaries in the neighborhood, Gregory ran inside and yelled to his son, "Travis, the guy's running down the street! Let's go, let's go, let's go!" Gregory and Travis grabbed their guns—a

---

911 and reported a burglary in progress. Travis noted that Arbery appeared to be reaching into his pocket or waistband area. By the time the police arrived, Arbery was gone.

Prior to February 23, 2020, however, Arbery was not the only person that surveillance cameras had picked up walking around the vacant property under construction. Cameras had also spotted a white couple walking into the vacant home. The owner of the property under construction had reported the matter to police, and, at the time of Arbery's death, law enforcement was in the process of trying to identify the individuals observed in the surveillance footage.

.357 Magnum revolver and Remington 12-gauge shotgun, respectively—and got in Travis's white F-150 pickup truck.

The McMichaels quickly caught up to Arbery, who at that point was near co-defendant Bryan's house. The McMichaels yelled at Arbery to stop running, but Arbery reversed course and began running in the opposite direction. Travis put the truck in reverse in pursuit of Arbery, who then reversed course again.

Bryan, a white male, witnessed this interaction from his front porch. He did not recognize Arbery or the McMichaels, and he did not know why Arbery was being chased. But his "instinct" told him that Arbery had done something wrong. So he shouted to the McMichaels, "Y'all got him?" He then got in his own pickup truck and joined the pursuit. By the time he pulled out of his driveway, the McMichaels had raced ahead of Arbery and blocked off Arbery's access to the end of Burford Drive. Arbery changed directions and started running back toward Bryan's house, at which point Bryan placed his car across the road to block Arbery's path, but Arbery was able to get around Bryan's truck and continue running toward the main exit of the neighborhood. Bryan then drove ahead and tried to cut off Arbery again. This time, the truck nicked Arbery, but he was still able to continue running. Bryan once more drove ahead of Arbery and used his truck to cut off Arbery's path, at which point Arbery took a right turn, running down Holmes Road—yet another road in the Satilla Shores neighborhood—and Bryan followed in pursuit.

At this point, the McMichaels had circled the neighborhood and had blocked Arbery's path on the other end of Holmes Road. When Arbery saw the McMichaels, he changed course and ran back at Bryan and eventually ran past Bryan's truck. As Bryan was turning his truck around, the McMichaels drove past Bryan and Arbery and stopped near the intersection of Holmes Road and Satilla Drive, again blocking Arbery's path. Travis exited the vehicle and stood at the open driver's side door with his shotgun. Meanwhile, Gregory was in the bed of the truck with his revolver. Arbery, who was now running toward that intersection, was sandwiched between Bryan—who was chasing him from behind—and the McMichaels—who were waiting with guns near the intersection.

As Arbery approached the McMichaels, he zig-zagged, and then ran around the passenger side of Travis's truck. Travis, who had been pointing his shotgun at Arbery from the driver's side of the truck, moved around to the front of the truck. After Arbery ran around the passenger side of the truck, Arbery ran at Travis to grab the shotgun. A struggle ensued and Travis fired at Arbery, cutting an artery in Arbery's wrist and puncturing his chest and lungs. Arbery continued to fight for the shotgun as Travis fired the shotgun two more times—one time missing Arbery and the other time hitting Arbery in his left armpit area. After a few seconds, Arbery stumbled forward and collapsed face first on the street, where he eventually bled to death.

Simultaneously, Gregory was on the phone with 911, reporting that there was "a black male running down the street." The call ended as Travis was firing his first shot. Officers, responding to the call, arrived on the scene shortly after. Neither the defendants nor the initial officer arriving on the scene rendered any aid to Arbery. Gregory, Travis, and Bryan talked freely with officers, giving their explanation of events: that they suspected Arbery of committing a crime, that Arbery would not stop running, and that Travis shot Arbery after Arbery lunged at him. No arrests were made on the scene. Later that afternoon, Gregory, Travis, and Bryan gave similar interviews at the police station.

### B. Criminal and other suspicious activity in Satilla Shores before February 23, 2020

The defendants attempted to justify their actions by linking Arbery with recent neighborhood crime. Travis and Gregory stated that they recognized Arbery as the same person they had seen on camera at the construction site.[4] Travis and Gregory also stated that there had been several break-ins and other criminal

---

[4] Notably, however, none of Arbery's visits were criminal trespass because he had never been (a) told to leave the property or (b) given notice that access to the property was forbidden. *See* O.C.G.A. § 16-7-21.

Further, the government put on evidence—Travis and Gregory's own willingness to trespass—that undermined their claim that preventing Arbery from trespassing is what fueled their pursuit. Travis posted a video on Facebook showing himself smacking down a no-trespassing sign so that he could hunt on private property. He also posted a video of him and Gregory talking about hunting on private property.

activity in the neighborhood recently.  At trial, the main evidence of this activity came from Facebook posts on the neighborhood Facebook page.  On July 1, 2019, someone posted that several unlocked cars in the neighborhood had been burglarized.  Travis commented on the post, "Arm up."  On July 14, 2019, Travis posted that there appeared to be a "hobo camp" under the Fancy Creek bridge near the neighborhood.[5]  Then, on November 19, 2019, surveillance videos from the house under construction were posted, showing Arbery walking around the property on November 18 and a white male and female walking around the property on November 17.  Travis commented, "They find him?" and "They are starting to play with fire."  On December 8, 2019, someone posted in the group that thieves had stolen several guns from a truck.  A suspect was caught on a surveillance camera—a white male.  And on January 1, 2020, Travis reported to police that a gun was stolen from his truck.

In sum, the evidence showed that Arbery had visited a construction site in Satilla Shores three times, but had not disturbed anything or committed any crimes, nor was he linked to any of the other criminal activity in the neighborhood.

---

[5] Gregory also called the non-emergency police line to alert the police that he saw someone who appeared to be homeless under the Fancy Creek bridge, and that the man may be responsible for recent automobile break-ins in the area.  The officer who investigated the report testified that the man "appeared to be Caucasian."

*C. Defendants' previous comments*

Because the interference with rights charge required the government to prove that the defendants acted because of Arbery's race, the government's case-in-chief included evidence—private conversations and social media posts—tending to show that each of the defendants held longstanding prejudice toward black people and supported vigilante justice.[6]

       i.       Travis's comments

Beginning with Travis's private conversations, the government presented the following evidence. On Facebook, Travis was sent a video of a black man playing a joke on a white man, to which Travis responded, "I'd kill that fucking n[*****]."[7] In another Facebook message, Travis was sent a picture of a white man dressed up as Trayvon Martin—painted in black face, holding Skittles and a Snapple, with a red blood splotch in the middle of his hoodie—with a comment that this man was "[t]he winner of Halloween 2016." Travis responded, "Fuck. Yes." In an Instagram message, Travis was sent a video depicting a black man putting a

---

[6] Defendants filed a motion *in limine* to exclude this evidence. The magistrate judge denied the motion, holding that the evidence was "plainly relevant [under Federal Rule of Evidence 404(b)] to determining whether Defendants acted with racial animus during the events forming the basis of the charges against them." Defendants do not challenge the admission of this evidence on appeal.

[7] While the evidence presented at trial was uncensored, we have censored the use of this racial slur throughout the opinion.

firecracker in his nose, to which Travis responded, "[b]een cooler if it blew that fucking n[*****]s head off."  And in a text message, Travis sent a picture of a person with Down syndrome wearing a shirt that said, "At least I'm not a n[*****]!"  In another text message exchange, Travis stated that he loved his job because "ZERO n[*****]s work with [him]."  Travis also called a coworker a "n[*****]-lover" because she formerly dated a black man.

The government presented the following evidence of Travis's Facebook posts and comments.  Travis commented, "Goddam savages," on a Facebook video of a black woman stealing a purse from an elderly white woman's shopping cart at the grocery store.  Travis posted a video on Facebook of two black people assaulting two white people, with the caption "Savages."  Travis then commented on the post that if black "savages" attacked his family, he "would beat those monkeys to death" and "would have the same remorse putting them down as [he] would a rabid coon."

The government also presented evidence tending to show Travis's support for vigilantism.  On the neighborhood Facebook page, Travis referred to thieves as "vermin."  Travis commented on a Facebook post about a participant to a home invasion robbery that he kept his "home shotgun loaded with high brass #5's.  [I]t will rip some[body] to shreds."

ii.    Gregory's comments

The government presented the following evidence of Gregory's racial animus.  In response to being told that a civil rights

leader had died, Gregory stated, "I wish that guy had been in the ground years ago" and that "[a]ll these blacks are nothing but trouble; I wish they would all die." He then proceeded to "rant against black people."

Additionally, one of Gregory's former neighbors testified that, during a conversation, Gregory referred to one of his former tenants as a "walrus" because she was "big and black." He bragged that when she was late to pay rent, he would cut her air conditioning off, and when he did that "[y]ou should have seen how fast her big fat black ass came with the rent check."

Gregory also posted a meme on Facebook with a quote stating, "White Irish slaves were treated worse than any race in the US. When was the last time you heard an Irishman bitching about how the world owes them a living. You won't. . . The Irish are not p[*]ssies looking for free shit. . ." (ellipses in original).

The government also presented posts and comments from Gregory's Facebook account tending to show Gregory's support for vigilantism. For example, Gregory shared two memes on his Facebook page. The first was a picture of a woman holding a shotgun and a baby, with a caption that said, "A gun in the hand is worth more than the entire police force on the phone." The second was a photo of a white man pointing a handgun with the following quote, "If violent crime is to be curbed, it is only the intended victim who can do it. The felon does not fear the police, and he fears neither judge nor jury. Therefore, what he must be taught is to fear his victim." And Gregory commented on a post

about a stolen surfboard, stating "Maybe I will catch the sorry SOB up here in Ga. We still hang horse and board thieves up here. Woe be unto the sticky-fingered bastard!"

### iii.    Bryan's comments

The government presented the following evidence of Bryan's racism. After learning that his daughter was dating a black man, Bryan messaged someone that his daughter "has her a n[*****] now" and that the boyfriend would "fit right in with the monkeys." Someone also sent Bryan a screenshot of a picture of his daughter and her boyfriend, along with a comment stating, "Just wanted to share with you and start your day with a good PUKE. Don't it make you proud," to which Bryan responded, "Like I said she don't give a fuck about herself why should we." On successive Martin Luther King Jr. holidays, Bryan messaged his friend to say he was working "so all the n[*****]s can take off!" and referenced a "monkey parade" happening on that day.

The government also presented evidence that Bryan associated black people with criminality. Bryan messaged a friend that his friend's wife should try to get disability benefits "like the n[*****]s that don't need it." And commenting on a Facebook post about a dirt bike being stolen, Bryan speculated that a "boot lip"—a racial slur he used to describe black people—stole it.

### D. Whether the streets of Satilla Shores were public or private

Because the interference with rights statute required the government to prove that the interference occurred because Arbery was using a facility "provided or administered by a State or

subdivision thereof," the government put on evidence that the roads of Satilla Shores, where the shooting occurred, were public roads.

The government called Anthony Vicent, the roads and drainage division manager at the Glynn County Department of Public Works. Vicent noted that, in 2021, the streets in Satilla Shores appeared on the county's list of public records as public roads. Vicent also discussed public records showing that the county had responded to citizen service requests for streets in Satilla Shores, including filling a gap in a curb with asphalt, cleaning a spill from a trash truck, and remediating flooded roads. Further, Vicent discussed county records showing that the county budgeted public funds to pave the streets in Satilla Shores. Vicent testified that the county did not fulfill these types of maintenance requests or budget money for private roads. Although records do not show that the county ever took formal title to these roads—in fact, the county explicitly denied formal title in 1958—Vicent testified that he has "no doubt" that the county maintained the streets where Arbery was pursued and killed.[8]

---

[8] As discussed *infra* note 13, the government also produced (over objection) Facebook posts from the Satilla Shores Homeowners Facebook Group discussing the status of the roads. Several months after the shooting, someone posted, "I am absolutely fed up with the circus in our neighborhood. We are looking to privatize our streets if anyone wants to get together." Another member commented, "You first have to purchase the roads from the County since they are county-maintained and then you can put up a gate." And

*E. Whether Travis's truck was an instrumentality of interstate commerce used in furtherance of the attempted kidnapping*

Because an element of attempted kidnapping is the use of an instrumentality of interstate commerce, the government introduced evidence that Travis's truck was an instrumentality of interstate commerce. It called FBI specialist Maria Pagan, who testified that Travis's truck was manufactured in the United States. The government also introduced records from the National Insurance Crime Bureau ("NICB"), authenticated by an affidavit, that showed that Travis's truck was manufactured in Missouri. However, defendants objected to the introduction of the NICB records because the authenticating affidavit was post-dated several days in the future. The district court overruled the objection, holding it was a scrivener's error, and admitted the records.

*F. Procedural History*

After the government concluded its case-in-chief, the defendants moved for a judgment of acquittal on all charges. On the interference with rights charge, they argued that the government did not prove that they acted because of Arbery's race or because of Arbery's use of public streets. And on the attempted kidnapping charge, they argued that the government did not prove they used an instrumentality of interstate commerce. The district

---

another commenter suggested forming a homeowners association and recruiting the help of an attorney.

court denied the motions. After the close of all evidence, defendants renewed the motions, which the court again denied.

The jury convicted each of the defendants as charged. The court sentenced Travis to life imprisonment plus ten years, Gregory to life imprisonment plus seven years, and Bryan to 420 months' imprisonment. The court ordered these sentences to run concurrently with their state sentences.

Gregory and Travis then filed post-judgment motions for acquittal under Federal Rule of Criminal Procedure 29(c), reiterating their prior arguments and adding arguments that the government failed to prove that the streets of Satilla Shores were "provided or administered" by Glynn County, and that the government failed to prove that they kidnapped Arbery for "ransom or benefit or otherwise." Their motions for acquittal were again denied, this time in a written order.

As to whether Gregory acted because Arbery was black (which only Gregory challenged), the court held that "there was substantial evidence of [Gregory's] racial animus against black people introduced at trial," and the jury could have inferred that this animus led Gregory "to make assumptions about Arbery's character and intent." Thus, the jury could have concluded that Gregory "acted as he did because of Arbery's race." As to whether Gregory acted because Arbery was using the streets of Satilla Shores (which only Gregory challenged), the court held that "[t]he evidence plainly permitted the jury to reach th[e] conclusion" that the offenses would not have occurred "but-for" the fact that Arbery

was using the streets in question. As to whether the streets of Satilla Shores were public, the court held that the interference with rights statute only required the county to "provide or administer" the road, not to formally hold title to the road. Given that the streets were open to the public and the county used county resources to maintain the streets, the court held that the evidence was "more than sufficient" for a jury to reasonably infer that the roads were public.

On the attempted kidnapping charge, the court held that the "evidence was more than sufficient to support a finding that the McMichaels attempted to kidnap Arbery for a benefit"—to satisfy and promote their own "vigilante desires." Finally, the court held that the McMichaels used Travis's truck as an instrumentality of interstate commerce. The court held that the truck did not actually have to be moving in interstate commerce at the time of the offense, and "there is no serious argument that the jury could not find the McMichaels used the truck[]" "in the way in which Congress" intended.

Defendants appealed.

## II.    Standard of Review

We review the sufficiency of the evidence to support a conviction *de novo*, considering the evidence in the light most favorable to the government and "resolv[ing] any conflicts in the evidence in favor of the [g]overnment." *United States v. Lander*, 668 F.3d 1289, 1296–97 (11th Cir. 2012). Similarly, "[w]e review *de novo* the district court's denial of a motion for judgment of acquittal,

applying the same standard used in reviewing the sufficiency of the evidence[.]" *United States v. Descent*, 292 F.3d 703, 706 (11th Cir. 2002) (italics added).

"The test for sufficiency of evidence is identical" for direct and circumstantial evidence, "and no distinction is to be made between the weight given to either direct or circumstantial evidence." *United States v. Mieres-Borges*, 919 F.2d 652, 656–57 (11th Cir. 1990). Proof of an element of a crime "may be established through circumstantial evidence or from inferences drawn from the conduct of an individual." *United States v. Utter*, 97 F.3d 509, 512 (11th Cir. 1996). "But where the government relies on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict." *United States v. Wenxia Man*, 891 F.3d 1253, 1265 (11th Cir. 2018) (alteration adopted) (quotations omitted).

"If a reasonable jury could have found [the defendant] guilty beyond a reasonable doubt, then we cannot overturn the jury's determination." *United States v. Vernon*, 723 F.3d 1234, 1266 (11th Cir. 2013) (quotations omitted); *United States v. White*, 663 F.3d 1207, 1213 (11th Cir. 2011) ("[W]e will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." (quoting *United States v. Hill*, 643 F.3d 807, 856 (11th Cir. 2011))). "[T]he evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at

trial." *United States v. Watts*, 896 F.3d 1245, 1251 (11th Cir. 2018) (quoting *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989)).

### III.    Discussion

On appeal, defendants make sufficiency of the evidence challenges to both their interference with rights convictions and attempted kidnapping convictions.  We consider these challenges in turn.

*A. Challenges to interference with rights convictions*

We start with defendants' challenges to their interference with rights convictions under 18 U.S.C. § 245(b)(2)(B).  Gregory and Bryan challenge the sufficiency of the evidence supporting the jury's underlying findings that the government proved beyond a reasonable doubt that they acted *because of* Arbery's race, and *because of* Arbery's use of the streets of Satilla Shores. And all three defendants challenge the sufficiency of the evidence supporting the jury's underlying finding that the streets of Satilla Shores were public roads "provided or administered" by Glynn County.  As we explain below, all of their challenges fail.

Before addressing the defendants' specific arguments related to their interference with rights convictions, we review the relevant    statute    and    its    elements.    A    violation    of 18 U.S.C. § 245(b)(2)(B) is found when someone

> [1] by force or threat of force [2] willfully injures, intimidates or interferes with, or attempts to injure, intimidate    or    interfere    with . . . any    person [3] because of his race, color, religion or national

> origin    and    [4a] because    he    is    or    has
> been . . . participating  in  or  enjoying  any  benefit,
> service,  privilege,  program,  facility  or  activity
> [4b] provided  or  administered  by  any  State  or
> subdivision thereof[.]

18 U.S.C. § 245(b)(2)(B).  The third and fourth (both 4a and 4b) elements are the only elements at issue in this appeal.  We address the relevant elements in turn.

> i.    There was sufficient evidence that Gregory
>       and Bryan acted because of Arbery's race

Gregory and Bryan argue that sufficient evidence did not support the jury's underlying finding that Gregory and Bryan acted because of Arbery's race. They present slightly different arguments.  Both defendants' arguments fail.

In order to convict defendants, the government needed to prove that defendants acted "because of" Arbery's "race, color, religion or national origin."  18 U.S.C. § 245(b)(2)(B).  The phrase "because of" imposes a "but-for" causation requirement. *See Burrage v. United States*, 571 U.S. 204, 212–13 (2014) (listing examples of Supreme Court's consistent interpretation of the phrase "because of" in statutes to require but-for causation).[9] Importantly, "but-for causality does not require that a single factor alone produce the particular result." *United States v. Feldman*, 936

_____

[9] Neither side argues that a standard other than but-for cause applies.  And the jury instructions below interpreted "because of" as requiring but-for causation, which neither side challenges on appeal.

F.3d 1288, 1311 (11th Cir. 2019).  Other factors can combine to produce the result, "so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back."  *Id.* (quoting *Burrage*, 571 U.S. at 211).  And of course, on appeal, our review is limited to whether sufficient evidence supported the finding that but for Arbery's race, defendants would not have acted.  *See White*, 663 F.3d at 1213 ("[W]e will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." (quoting *Hill*, 643 F.3d at 856)).

Beginning with Gregory, the government presented substantial evidence of Gregory's racial animus in the form of testimony regarding racially charged comments Gregory made during private conversations and on his Facebook page.  Along with evidence of racial animus, the government also produced evidence that Gregory reacted much less severely to a white man whom he suspected of breaking into neighborhood cars.  And Gregory's alleged concern over Arbery's potential trespassing is undermined by the evidence of Gregory's own willingness to trespass.  This evidence, viewed in the light most favorable to the jury verdict, was sufficient for a reasonable juror to find that Arbery's race was the determinative factor for Gregory's actions.  *See Lander*, 668 F.3d at 1296–97.

Nevertheless, Gregory argues that there was insufficient evidence that Arbery's race was the "but-for" cause of Gregory's decision to pursue Arbery.  Instead, he maintains that the evidence

showed that his actions—as a retired investigator with decades of experience—were motivated solely by recognizing Arbery from the surveillance footage of the home under construction. Gregory states that the evidence showed that Arbery's skin color played a "nonessential contributing role," and was "a fact of no greater import to [Gregory's] calculus than [ ] Arbery's biological sex, the shorts he was wearing, his hairstyle, or his tattoos." We disagree. Viewing the evidence—that (1) Gregory had made several racially charged statements, (2) Gregory reacted much less severely when he suspected a white man of breaking into neighborhood cars, and (3) Gregory himself trespassed—in the light most favorable to the verdict, a reasonable juror could have found that Arbery's race, rather than his suspected trespassing, was the determinative factor for Gregory's actions. While race being the but-for cause of Gregory's pursuit of Arbery may not have been the only reasonable interpretation of the evidence, "the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *Watts*, 896 F.3d at 1251 (quoting *Poole*, 878 F.2d at 1391).

Turning to Bryan, the government also presented substantial evidence of his racial animus in the form of numerous racially charged text messages sent by Bryan. And the government also presented evidence that Bryan associated black people with criminality, including text messages that Bryan sent his friend about black people stealing disability checks, a comment on a Facebook post using a derogatory term to state that a black man was responsible for stealing a dirt bike, and the fact that Bryan

stated that his "instinct" told him that Arbery had done something wrong despite not knowing anything about the situation.

Bryan argues that he decided to pursue Arbery because he saw Arbery being chased, and Arbery never called for help or signaled that he was being unfairly pursued. Thus, he assumed that Arbery had done something wrong, and he wanted to capture Arbery's face on video. But given the totality of the evidence and circumstances viewed in the light most favorable to the verdict, the jury could have reasonably inferred that Bryan's "instinct" and decision to act were based on Arbery's race. *See Lander*, 668 F.3d at 1296–97. Again, while Arbery's race being the but-for cause of Bryan's decision to act may not have been the only reasonable interpretation of the evidence, "the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *Watts*, 896 F.3d at 1251 (quoting *Poole*, 878 F.2d at 1391).

> ii.    There was sufficient evidence that Gregory and Bryan acted because of Arbery's use of the streets of Satilla Shores

Gregory and Bryan argue that the jury's underlying finding that they acted because of Arbery's use of the streets of Satilla Shores was not supported by sufficient evidence. Their arguments fail.

In order to convict defendants, the government was required to prove that defendants acted "because of" Arbery's enjoyment of a "facility." 18 U.S.C. § 245(b)(2)(B). As discussed

above, the phrase "because of" imposes a "but-for" causation requirement, which the parties do not dispute on appeal. *See Burrage*, 571 U.S. at 212–13 (listing examples of Supreme Court's consistent interpretation of the phrase "because of" in statutes to require but-for causation). And all parties agree, and courts have uniformly held, that a city street is a facility under § 245. *See, e.g., United States v. Nelson*, 277 F.3d 164, 192–93 (2d Cir. 2002) (holding that "the term 'facility' clearly and unambiguously includes city streets within its meaning"); *United States v. Cazares*, 788 F.3d 956, 990 (9th Cir. 2015) (same). On appeal, our review is limited to whether sufficient evidence supported the finding that but for Arbery's use of a facility—*i.e.*, the streets of Satilla Shores[10]—defendants would not have acted. *See White*, 663 F.3d at 1213 ("[W]e will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." (quoting *Hill*, 643 F.3d at 856)).

Sufficient evidence supported the jury's underlying finding that Arbery's use of the streets of Satilla Shores was a but-for cause of Gregory's and Bryan's actions. The chase started when Gregory saw Arbery running down the street. Indeed, as soon as Gregory saw Arbery running down the street, he shouted, "Travis, the guy's running down the street! Let's go, let's go, let's go!" Bryan also started his pursuit after he saw Arbery running down the street.

---

[10] We will tackle the narrower issue of whether the streets of Satilla Shores are a facility that is "provided or administered by any State or subdivision thereof," as required by § 245(b)(2)(B), in Section III.A.iii.

Additionally, the streets were integral to the offense as the entire chase and killing occurred on the streets of Satilla Shores. *See Nelson*, 277 F.3d at 198 (citing cases for the proposition that circumstantial evidence is sufficient for jury to infer defendants' intent to deprive individual of access to a public facility under § 245(b)(2)(B)). In other words, the defendants acted because of Arbery's use of the streets of Satilla Shores.

Gregory and Bryan argue that Arbery's presence on the streets of Satilla Shores was not a determinative factor in their decision to pursue Arbery, because, had Arbery been running through the private yards of their neighbors, they still would have pursued Arbery. While Gregory and Bryan's argument that they would have still pursued Arbery even if Arbery were running through their neighbor's yards is plausible, the jury was not required to draw that inference. *See Watts*, 896 F.3d at 1251. The streets were integral to the offense—defendants used their trucks to block Arbery from using the streets to escape. Thus, it was similarly reasonable to infer that, but for Arbery's use of the streets of Satilla Shores, the specific crime would not have occurred.

> iii.    There was sufficient evidence that the streets of Satilla Shores are provided or administered by Glynn County

All three defendants argue that the jury's underlying finding that the streets of Satilla Shores are "provided or administered" by Glynn County as contemplated by § 245 was not supported by

22-12792                Opinion of the Court                25

sufficient evidence.[11]  Defendants argue that the phrase "provided or administered" in the statute does not mean, as the district court defined the phrase in its order denying defendants' motion for acquittal, that "a state or political subdivision maintains the particular facility in a condition suitable for use."    Instead, defendants argue that § 245 requires proof that a public entity has ownership or title over the facility (express or implied), as set out under Georgia law.  As we explain below, their arguments fail.

We start where all statutory construction starts, with the language of the statute itself.  Section 245 prohibits interfering with the enjoyment of a facility "provided or administered by any State or subdivision thereof[.]"[12]  18 U.S.C. § 245(b)(2)(B).  The parties dispute the statutory terms "provided or administered by."  These terms are not defined by the statute, and when "term[s] go[] undefined in a statute, we give the term[s their] ordinary meaning," *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012), as those

---

[11] While Gregory and Travis challenged the sufficiency of the evidence supporting the jury's underlying finding that the streets of Satilla Shores are "provided or administered" by Glynn County in their post-verdict Rule 29 motions, Bryan did not file a post-verdict motion or attempt to adopt the arguments of his codefendants.  When a sufficiency argument is not preserved below, we will reverse a conviction only if "necessary to prevent a manifest miscarriage of justice." *United States v. Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013) (quoting *United States v. Greer*, 440 F.3d 1267, 1271 (11th Cir. 2006)).  Although this heightened standard applies to Bryan's claim, we note that his challenge fails under any standard for the reasons discussed in this section.

[12] The jury was instructed in accordance with the statutory language.  The parties do not challenge the jury instructions.

terms were "understood at the time the law was enacted," *United States v. Chinchilla*, 987 F.3d 1303, 1308 (11th Cir. 2021). "To ascertain ordinary meaning, [we] often turn to dictionary definitions for guidance." *United States v. Lopez*, 590 F.3d 1238, 1248 (11th Cir. 2009). The statute was enacted in 1968, so we look to contemporary sources from around that time for meaning. *See id*; Civil Rights Act of 1968, Pub. L. No. 90-284, 82 Stat. 73. At that time, "provide" was defined in relevant part as "to supply what is needed for sustenance or support." Webster's Third New International Dictionary 1827 (1966). And "administer" was defined as "to manage the affairs of" or "to direct or superintend the execution, use, or conduct of." *Id*. at 27. Thus, the ordinary meaning of these terms does not include any requirement of formal title or ownership. Rather, the ordinary meaning of the terms "provide" and "administer" are consistent with the district court's conclusion that the requirement is met if "a state or political subdivision maintains the particular facility in a condition suitable for use."

Furthermore, contrary to the defendants' position, the two cases relied upon by the district court in its analysis—*United States v. White*, 846 F.2d 678 (11th Cir. 1988), and *United States v. Griffin*, 585 F. Supp. 1439 (M.D.N.C. 1983)—are consistent with the plain and ordinary meaning of "provide" and "administer." At issue in both cases was whether the city "provide[d] or administer[ed]" a parade that it did not organize. In each case, the courts held that the city did "provide[] or administer[]" the parade—mainly because

the city had regulations dealing with public demonstrations and provided police oversight at the parades.

The first case, *White*, involved a parade organized by the Southern Christian Leadership Conference (SCLC). 846 F.2d at 682. At the parade, the Ku Klux Klan clashed with black marchers. *Id.* Several persons, including police officers that were providing security for the parade, sustained injuries. *Id.* One of the Klansmen was prosecuted under § 245(b)(2)(B). *Id.* at 684. The district court acquitted him, holding that the government failed to demonstrate that the parade was "provided or administered by" the city. *Id.* at 694. We reversed, explaining that the district court had interpreted the meaning of "administered" too narrowly. While acknowledging that the city did not direct the demonstration and parade organizers were not required to get a permit from the city, we noted that the city had ordinances regulating public demonstrations, the SCLC organizers had met with the police chief two to three days before the march to discuss the details of the police route, and the police chief agreed to provide extra security. *Id.* at 694–95 & n.27. We held that such circumstances fell within the ambit of § 245's coverage. *Id.* at 695.

The second case, *Griffin*, involved the disruption of an anti-Klan parade by the Ku Klux Klan. 585 F. Supp. at 1440. Defendants sought to have their indictment dismissed, arguing, in part, that the anti-Klan parade was not "administered" by the city. *Id.* at 1442. The district court denied the motion. *Id.* It reasoned that, while the city could not have prohibited the parade because of its

message, the city regulated the time, place, and manner of the parade, and required the organizers to get a parade permit. *Id.* Thus, the district court held that the city "took an active role in controlling and managing the parade," as it had "thorough involvement" in the details of the parade, which "qualifie[d] [the] parade as having been 'administered' by the city . . . within the meaning of 18 U.S.C. § 245(b)(2)(B)." *Id.*

Accordingly, "provide[] or administer[]" does not require the county to own or have title to the facility (express or implied)—rather, it is sufficient that a county maintain the particular facility in a condition suitable for use. Thus, defendants falter in placing dispositive weight (1) on the fact that Glynn County explicitly rejected the dedication of the streets of Satilla Shores from a private developer in 1958, and (2) on their argument that Glynn County has not subsequently impliedly accepted the dedication by exhibiting "dominion or control" over the streets of Satilla Shores. Instead, the proper focus is whether sufficient evidence supported the jury's underlying finding that the streets of Satilla Shores were maintained by Glynn County in a condition suitable for use.

Copious evidence supports the jury's underlying finding that Glynn County "provided or administered" the streets of Satilla Shores. For example, Vicent, the roads and drainage division manager at the Glynn County Department of Public Works, testified that the streets in Satilla Shores were included in the department's list of public roads. Vicent also discussed public records showing that the county had responded to citizen service

requests for streets in Satilla Shores—which it does not do for private roads—including filling a gap in a curb with asphalt, cleaning a spill from a trash truck, and remediating flooded roads. Vicent also discussed county records showing that the county budgeted public funds to pave streets in Satilla Shores. While there was no direct evidence that the county conducted the work, the videos from February 23, 2020, show that the streets were in working order. And although the county explicitly denied formal title in 1958, Vicent testified that he has "no doubt" that the county maintained the streets where Arbery was pursued and killed. Finally, aerial footage of the neighborhood showed that the streets were open to the public, as there were no visible gates or restrictions.[13]

Defendants' attempts to undermine the probative value of Vicent's testimony and the public records come up short. First,

---

[13] As discussed *supra* note 8, the government also introduced several Facebook posts of homeowners in Satilla Shores discussing privatizing the roads, suggesting that the homeowners in the neighborhood thought that the roads were public. For the first time on appeal, Travis makes a hearsay challenge to the district court's admission of these posts. However, we will not reverse a conviction based on an unpreserved evidentiary error unless that error was so prejudicial that it affected the outcome of the district court proceedings. *See United States v. Campbell*, 223 F.3d 1286, 1288 (11th Cir. 2000) (applying plain error to unpreserved evidentiary challenge). And as discussed above, even without the Facebook posts, sufficient evidence supported the jury's decision that the streets of Satilla Shores were "provided or administered by" Glynn County. Thus, even if admitting the posts was an evidentiary error, the error was not "so prejudicial that it affected the outcome of the district court proceedings." *See id.*

they argue that the service tickets relate mostly to work done related to or incident to the broader "right-of-way," not the streets themselves.    But even assuming this distinction matters, defendants concede that some work was done on the streets themselves—they just argue it was not significant work.  Yet even on defendants' view of the record, there were fourteen service tickets involving a citizen complaint about the "road," a "roadway spill," or "traffic."  Second, they argue that the county commission minutes that the government introduced were "largely undated, usually unpaginated, and often incomplete."  But judging the reliability and probative value of the commission minutes is a task firmly within the province of the jury.  *See McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) ("It is the jury's task—not [the court's]—to weigh conflicting evidence and inferences, and determine the credibility of witnesses." (quotation omitted)).

Ultimately, defendants have not met their steep burden of showing that "no trier of fact could have found guilt beyond a reasonable doubt" based on the evidence in the record.  *White*, 663 F.3d at 1213 (quoting *Hill*, 643 F.3d at 856).  Thus, considering the evidence in the light most favorable to the government and "resolv[ing] any conflicts in the evidence in favor of the [g]overnment," sufficient evidence supported the jury's decision that the streets of Satilla Shores were "provided or administered" by Glynn County.  *Lander*, 668 F.3d at 1296–97.

### B. *Challenges to the attempted kidnapping convictions*

The jury convicted Travis, Gregory, and Bryan of attempted kidnapping under 18 U.S.C. § 1201(a).  As relevant here, a violation of 18 U.S.C. § 1201(a) occurs when someone:

> [1] unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and [2] holds for ransom or reward or otherwise any person . . . [3] when . . . the offender . . . uses . . . [an] instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense[.]

18 U.S.C. § 1201(a)(1).  Only the second and third elements are at issue on appeal.  All defendants challenge the sufficiency of the evidence supporting the jury's underlying finding that they acted "for ransom or reward or otherwise."  And Travis and Gregory challenge the sufficiency of the evidence supporting the jury's underlying finding that they used an instrumentality of interstate commerce in furtherance of the offense.  Each argument is discussed in turn.

> i.    There was sufficient evidence that defendants acted "for ransom or reward or otherwise"

All three defendants[14] argue that the jury's underlying finding that defendants acted for "ransom or reward or otherwise"

---

[14] Travis does not discuss this argument in his brief, other than to adopt the argument of the other defendants.  We may thus decline to consider his

was not supported by substantial evidence because the government did not prove that they acted for a tangible benefit. Their argument fails.

Under the kidnapping statute, § 1201(a), the government needed to show that defendants kidnapped Arbery "for ransom or reward or otherwise." We have held that "the prosecution need only establish that the defendant acted for *any* reason which would in *any* way be of benefit." *United States v. Lewis*, 115 F.3d 1531, 1536 (11th Cir. 1997) (emphasis in original) (quotation omitted) (holding that kidnapping victim for "companionship" counted as a benefit); *United States v. Duncan*, 855 F.2d 1528, 1536 (11th Cir. 1988) ("The motivation of rape is admissible to show that the defendant kidnapped for a benefit . . . .") Indeed, "almost any purpose satisfies the § 1201 requirement of kidnapping for a benefit." *Duncan*, 855 F.2d at 1534; *see also, e.g.*, *United States v. Parker*, 103 F.2d 857, 861 (3d Cir. 1939) (holding that a detective trying to enhance his reputation by obtaining a confession from a suspect whom he illegally detained counted as a benefit); *Brooks v. United*

---

challenge because sufficiency arguments "are too individualized to be generally adopted." *United States v. Cooper*, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000) (quotation omitted). But even if we considered his argument, it fails on the merits for the reasons discussed in this section.

Additionally, Bryan failed to raise this argument below. When a sufficiency argument is not preserved below, the Court will reverse a conviction only if "necessary to prevent a manifest miscarriage of justice." *Fries*, 725 F.3d at 1291 (quoting *Greer*, 440 F.3d at 1271). This heightened standard applies to Bryan, although the challenge fails under any standard for the reasons discussed in this section.

*States*, 199 F.2d 336, 336–37 (4th Cir. 1952) (KKK members' intent to whip a man and woman and tell them to "stop living together and making liquor and to attend church" was an adequate benefit).

The jury had ample evidence that defendants attempted to kidnap Arbery for a benefit.  Based on their posts supporting vigilantism and associating black people with criminality, the jury could have reasonably inferred that the defendants acted to boost their reputation as neighborhood crime-stoppers, to remove suspected criminals from their streets, or to promote their sense of vigilante justice.  Or, based on their racist and often violent language, the jury could have reasonably inferred that they acted to gain some personal satisfaction by inflicting violence on a black man.  *Id.*  Under the broad language of the statute and caselaw interpreting it, any of these motivations constitute a benefit.

> ii.   There was sufficient evidence that Travis and Gregory used an instrumentality of interstate commerce

Travis and Gregory argue that the jury's underlying finding that they used Travis's truck as an instrumentality of interstate commerce during the commission of the crime was not supported by sufficient evidence.  We disagree.

We begin our discussion by observing that a defendant can violate the relevant provision of the kidnapping statute, § 1201(a)(1), in one of three ways.  First, a defendant violates the statute if his kidnapping victim "is willfully transported in interstate or foreign commerce."  18 U.S.C. § 1201(a)(1).  Second, a defendant

violates the statute if he "travels in interstate or foreign commerce" during the offense. *Id.* Or third, a defendant violates the statute if he "uses the mail or any means, facility, or *instrumentality of interstate or foreign commerce* in committing or in furtherance of the commission of the offense." *Id.* (emphasis added).

In this case, only the third way of violating the kidnapping statute is relevant. The evidence shows, and no party disputes, that Arbery stayed within the Satilla Shores neighborhood in Glynn County, Georgia, so he was not "willfully transported in interstate or foreign commerce." *Id.* Similarly, the McMichaels stayed within the Satilla Shores neighborhood during the shooting, so they did not "travel[] in interstate or foreign commerce," either. *Id.* Accordingly, we must decide whether the McMichaels used "the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." *Id.* Their indictment charged that they did, when they "used an instrumentality of interstate commerce (a truck driven by TRAVIS MCMICHAEL and a truck driven by WILLIAM 'RODDIE' BRYAN). Specifically, the three defendants chased Arbery through the neighborhood, using their trucks" to chase Arbery and prevent his escape.

We hold that automobiles, like Travis's truck, are *per se* instrumentalities of interstate commerce. Our conclusion flows directly from the Interstate Commerce Clause of the Constitution and our precedent interpreting it. The Interstate Commerce Clause gives Congress the power to "regulate

Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. In interpreting this clause, the Supreme Court has "identified three broad categories of activity that Congress may regulate under its commerce power." *United States v. Lopez*, 514 U.S. 549, 558 (1995). Those categories are (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and (3) "those activities having a substantial relation to interstate commerce." *Id.* at 558–59.

At issue in this case is *Lopez*'s second category, "instrumentalities of interstate commerce." *Id.* at 558. As set forth previously, under § 1201(a)(1), the government needed to show that defendants used an "instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." We have recognized that "[i]nstrumentalities of interstate commerce [include] the people and things themselves moving in commerce, including automobiles." *United States v. Ballinger*, 395 F.3d 1218, 1226 (11th Cir. 2005) (en banc). In *Ballinger*, we held that Congress could proscribe the defendant's conduct, which involved using "a van (an instrumentality of commerce)." *Id.* at 1228. Instrumentalities of interstate commerce also include "airplanes, boats, and shipments of goods." *Id.* at 1226; *see, e.g.*, *Perez v. United States*, 402 U.S. 146, 150 (1971) (referring to an aircraft as an instrumentality of interstate commerce); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 189–90 (1824) (explaining that the commerce power must include the power to regulate "the admission of the vessels of" another nation or the power to

"prescrib[e] what shall constitute American vessels"); *cf. Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 445–46 (1979) (holding that a Japanese company's "cargo shipping containers" were "instrumentalities of foreign commerce, both as a matter of fact and as a matter of law" (footnotes omitted)).

Our recognition in *Ballinger* that the defendant's van was an instrumentality of interstate commerce, and our recognition in this case that the McMichaels' truck was an instrumentality of interstate commerce, neatly fits with how courts have recognized other channels and instrumentalities of interstate commerce. As the Supreme Court has explained, the "channels" of interstate commerce are the "transportation routes through which persons and goods move," *United States v. Morrison*, 529 U.S. 598, 613 n.5 (2000) (quotation omitted), and the "instrumentalities of interstate commerce" are the "various forms of transportation equipment" by which a person travels those routes, *Japan Line Ltd.*, 441 U.S. at 444. For example, courts have recognized that railroads are channels of interstate commerce, *see, e.g.*, *Houston, E. & W. Tex. Ry. v. United States*, 234 U.S. 342, 353–54 (1914), and railcars are instrumentalities of interstate commerce—even when used purely intrastate, *see, e.g.*, *S. Ry. v. United States*, 222 U.S. 20, 26–27 (1911). Similarly, airspace is a channel of interstate commerce, *see, e.g.*, *Ickes v. F.A.A.*, 299 F.3d 260, 263 (3d Cir. 2002), and airplanes categorically are instrumentalities of interstate commerce, *see, e.g.*, *Perez*, 402 U.S. at 150. Highways, too, are channels of interstate commerce. *See, e.g.*, *Pierce County v. Guillen*, 537 U.S. 129, 146–47 (2003); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256–

58 (1964).     Because automobiles are the "transportation equipment" used to traverse highways, *see Japan Line Ltd.*, 441 U.S. at 444, automobiles fit as the "instrumentalities" used on highways, just as railcars and airplanes are the instrumentalities used on railroads and in airspace, respectively.[15]  *See Ballinger*, 395 F.3d at 1225–26.  Indeed, in *Ballinger* we recognized this principle when we held that Congress could proscribe conduct that "entailed weeks of travel in a van (an instrumentality of commerce) along interstate highways (a channel of commerce)."  *Id.* at 1228.[16]

As we explained in *Ballinger*, however, instrumentalities and channels of interstate commerce need not always be paired for Congress to regulate them.  Instead, we stated that "Congress may invoke *any or all* of [*Lopez's*] three categories of commerce power in any piece of legislation."  *Id.* at 1231 (emphasis added).  And "congressional power to regulate the . . . instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature."  *Id.* at 1226.

---

[15] Were we to hold otherwise, as the dissent urges, by concluding that not all automobiles are instrumentalities of interstate commerce, we would create a strange mismatch wherein highways, unlike other channels of interstate commerce, are categorical "channels" of interstate commerce without a corresponding, categorical "instrumentality" used to access them.

[16] We also recognized that the Supreme Court has, at various times, called interstate highways "instrumentalities" of interstate commerce. *Ballinger*, 395 F.3d at 1225 n.3.  We concluded, however, that highways are best categorized "as channels of commerce, since they are routes for the interstate transportation of people and goods."  *Id.*

Accordingly, Congress may regulate even local use of instrumentalities of interstate commerce absent an accompanying channel (*e.g.*, an interstate highway). *See S. Ry.*, 222 U.S. at 27 (upholding amendments to the Safety Appliance Act as applied to vehicles used in intrastate commerce). Thus, automobiles can be "instrumentalities of interstate commerce" under § 1201(a)(1) regardless of whether their use during a kidnapping is interstate or "purely local." *Ballinger*, 395 F.3d at 1226.

By holding that intrastate use of an automobile alone satisfies the "instrumentality of interstate commerce" element of 18 U.S.C. § 1201(a)(1), we join our two sister circuits to have considered the same question.[17] *See United States v. Windham*, 53

---

[17] The dissent leans on a different circuit's decision that declined to hold motor vehicles were *per se* instrumentalities of interstate commerce; however, as the court there recognized, motor vehicles are a materially different classification from the automobiles we consider here. *See United States v. Chavarria*, 140 F.4th 1257, 1266–67 (10th Cir. 2025). In *United States v. Chavarria*, two defendants were charged with kidnapping resulting in death under § 1201(a). *Id.* at 1259. The superseding indictment, which the district court dismissed, alleged that the defendants accomplished their crime using "a motor vehicle, a means, facility, and instrumentality of interstate commerce." *Id.* (quotation omitted). The Tenth Circuit declined to hold that "'motor vehicles' are always presumed to be instrumentalities of interstate commerce" because "motor vehicle" is a broad term that can encompass, for example, "e-bikes," "[l]awnmowers," "[e]lectric scooters," "[e]levators," and "[m]otorized [w]heelchairs." *Id.* at 1265–66. The Tenth Circuit explicitly distinguished out-of-circuit cases that considered only "car[s]" and "automobile[s]" like we now consider. *Id.* at 1266–67. And in any event, the Tenth Circuit did not need to consider our *Ballinger* precedent. Moreover, we also note that the indictment

F.4th 1006, 1013 (6th Cir. 2022) (holding that "[w]hen a car . . . is used in committing or in furtherance of a kidnapping for ransom, reward, or otherwise, the federal kidnapping statute applies" regardless of whether the car was used interstate (quotation omitted)); *United States v. Protho*, 41 F.4th 812, 828–29 (7th Cir. 2022) (holding that under § 1201(a)(1), "it's the *nature* of the regulated object's class (here, automobiles) rather than the particular *use* of one member of that class (Protho's Ford Explorer) that matters" in determining whether a defendant used an instrumentality of interstate commerce); *United States v. Frazier*, 129 F.4th 392, 402–03 (7th Cir. 2025) (holding that the defendants' Dodge Durango was an instrumentality of interstate commerce even though the entire kidnapping "happened in East St. Louis, Illinois").

Moreover, other courts have repeatedly held that intrastate use of automobiles satisfies the "instrumentalities of interstate commerce" element of the federal crime of carjacking under 18 U.S.C. § 2119. *See United States v. Bishop*, 66 F.3d 569, 590 (3d Cir. 1995) ("conclud[ing] that motor vehicles are instrumentalities of interstate commerce" even where "the wrongful conduct . . . occurs wholly intrastate"); *United States v. Cobb*, 144 F.3d 319, 322 (4th Cir. 1998) (holding that "[c]ars, like trains and

---

in this case did not, as it did in *Chavarria*, simply say "motor vehicle." Rather, it specified that the McMichaels used "a truck" in "an attempt to restrain Arbery, restrict his free movement, corral and detain him against his will, and prevent his escape."

aircraft" are instrumentalities of interstate commerce even though "not every car, train, or plane trip has an interstate destination" because they are "inherently mobile and indispensable to the interstate movement of persons and goods"); *United States v. Oliver*, 60 F.3d 547, 550 (9th Cir. 1995) ("[C]ars are themselves instrumentalities of commerce, which Congress may protect."). Accordingly, we join our sister circuits and hold that automobiles are *per se* instrumentalities of interstate commerce.

That conclusion resolves this issue. Because Travis's truck was an automobile, it was an instrumentality of interstate commerce even though defendants used the truck "purely local[ly]." *Ballinger*, 395 F.3d at 1226. Accordingly, the jury had sufficient evidence to convict defendants of violating § 1201(a)(1).[18] Thus, we reject defendants' argument to the contrary.

---

[18] Travis argues that the district court abused its discretion in admitting the NICB records to prove the instrumentality prong of his attempted kidnapping charge. Travis argues that the affidavit authenticating the records showing that Travis's truck was manufactured in the United States contained the wrong certification date, and that the district court abused its discretion in calling it a scrivener's error and allowing the government's witness to testify from the records. We review evidentiary rulings for abuse of discretion. *See United States v. Crabtree*, 878 F.3d 1274, 1287 (11th Cir. 2018). The district court did not abuse its discretion in overlooking an obvious scrivener's error such as an error in the date, especially because the date had no consequence to the probative value of the records showing that Travis's truck was manufactured in Missouri, and Travis does not dispute the actual content of the records. In any event, because we determine that automobiles are *per se* instrumentalities of commerce, if the admission were error, it was harmless error.

Defendants' argument that the truck was not used in "the way in which Congress foresaw the instrumentality to be used" because it was used as a barricade fails too—the truck was used to drive around the streets of Satilla Shores in pursuit of Arbery, and then was parked in the street to trap Arbery. It was reasonable for the jury to conclude that the truck, in being driven on and parked on a road, was being used as intended.

In response to our conclusion, the dissent raises several consequentialist concerns and advocates for a case-by-case determination about whether any given automobile sufficed to be an instrumentality of interstate commerce. But our decision today, that automobiles are instrumentalities of interstate commerce, breaks little new ground. As discussed, our decision naturally flows from our opinion in *Ballinger* wherein we stated that "automobiles" are "[i]nstrumentalities of interstate commerce," and such instrumentalities may be federally regulated "even if the targeted harm occurs outside the flow of commerce and is purely local in nature." 395 F.3d at 1226. Moreover, many of our sister circuits have reached the same (or a very similar) conclusion long before us. *See, e.g.*, *Windham*, 53 F.4th at 1013; *Protho*, 41 F.4th at 828–29; *Cobb*, 144 F.3d at 322; *Bishop*, 66 F.3d at 590; *Oliver*, 60 F.3d at 550. Far from blazing a new trail through the wilderness, our decision today merely walks the paved road laid before us by this Court sitting en banc and our sister circuits.

The dissent also states that our decision creates inconsistencies with other statutes that refer to motor vehicles "in"

interstate commerce.  We disagree.  Statutes that regulate vehicles "in" commerce, by their terms, regulate a different, more limited class of vehicles than statutes that regulate (as here) vehicles "of" commerce.  The former regulate vehicles actually traveling in interstate commerce, while the latter regulate vehicles that could be used in interstate commerce.  *See Windham*, 53 F.4th at 1012–13. Congress need not legislate to its maximum constitutional authority in every statute, and the fact that Congress chose to regulate a more limited class of vehicles in other statutes does not mean Congress limited § 1201(a)(1) in the same way.  *See Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam) ("Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice . . . .").  Indeed, the textual differences between the kidnapping statute—referring to "instrumentalit[ies] *of* interstate . . . commerce"—and the dissent's cited statutes— referring to motor vehicles "*in* interstate commerce"—is good evidence that Congress deliberately chose not to limit the kidnapping statute as the dissent describes.  *See* 18 U.S.C. § 1201(a)(1); *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1089 (11th Cir. 2017) (en banc) ("When Congress uses different language in similar sections, we should give those words different meanings." (quotation omitted)).

In sum, defendants traveled in a truck in pursuit of Arbery; therefore, they "use[d] . . . [an] instrumentality of interstate . . . commerce in committing or in furtherance of the

commission of" kidnapping.  18 U.S.C. § 1201(a)(1).  Accordingly, we hold that the jury had sufficient evidence to convict defendants.

## IV.    Conclusion

For the reasons discussed above, we affirm defendants' convictions.

**AFFIRMED.**

22-12792          CALVERT, J., Dissenting in Part                    1

CALVERT, District Judge, Concurring in Part and Dissenting in Part:

I join all of the Court's opinion except for Part III.B.ii, which holds that automobiles are *per se* instrumentalities of interstate commerce and therefore there was sufficient evidence to affirm Travis's and Gregory's convictions for attempted kidnapping. Although the majority's opinion on this point may align with the view of other circuits, I believe it places our circuit on the wrong side of a developing split by overly broadening federal jurisdiction over automobiles.

As the majority explains, to sustain a conviction for attempted kidnapping when the kidnapped person is not transported in interstate or foreign commerce, the evidence must show that the offender "travel[ed] in interstate or foreign commerce or use[d] the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. § 1201(a)(1). Here, the evidence showed that the defendants used Travis's truck to drive on the streets of a residential community to pursue Arbery and then parked Travis's truck to block Arbery from fleeing. There was no interstate travel, no use of the interstate highway system, no exchange of communications via phone or text message, and no use of the internet. Nor is there any indication that Congress, in enacting § 1201, contemplated that automobiles would be treated as instrumentalities of interstate commerce. Nonetheless, the majority holds that all automobiles, including Travis's truck, are *per se* instrumentalities of commerce. I believe

the majority's holding raises constitutional concerns about the balance between state and federal prosecution and does not align with the purpose and text of § 1201.

I.

First, the constitutional issue. In drafting the jurisdictional element "instrumentalities of interstate commerce" in 18 U.S.C. § 1201, it appears Congress drew on *United States v. Lopez*, 514 U.S. 549, 558–59 (1995), which enumerated categories of activity that Congress can regulate under its Commerce Clause power. I discuss the categories in more detail below, but at issue here is the second *Lopez* category—that "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U.S. at 558. Where, as in this case, Congress writes an offense's jurisdictional element "to mirror the Supreme Court's articulation in *Lopez* of the nature and extent of the commerce power," questions of statutory interpretation and as-applied constitutional challenges are essentially co-extensive. In other words, cases involving as-applied challenges are useful authority in statutory interpretation cases. *United States v. Ballinger*, 395 F.3d 1218, 1224, 1235 (11th Cir. 2005) (en banc) ("Finally, the argument that Ballinger has cast as an as-applied challenge to the constitutionality of § 247 seems really to raise a question of statutory construction—namely, whether, by its specific terms, § 247 covers Ballinger's conduct."). Thus, even though Travis and

22-12792          CALVERT, J., Dissenting in Part          3

Gregory only raised a statutory challenge, unavoidable constitutional concerns lurk.

In sustaining the convictions at issue, the majority relies on the en banc Court's analysis in *Ballinger*. 395 F.3d at 1226. *Ballinger* involved a defendant who drove between four states to burn churches and was convicted of destruction of religious property on account of their religious character under a statute requiring a showing that the "offense is in or affects interstate or foreign commerce." *Id.* at 1223–24 (quoting 18 U.S.C. § 247). Ballinger appealed his conviction on constitutional grounds, arguing that "arson is a purely intrastate activity that can rarely, if ever, be 'in commerce.'" *Id.* at 1230.

The Court rejected Ballinger's argument, explaining that under *Lopez*, Congress can regulate three broad categories of activity under its commerce power: 1) channels of interstate commerce, such as interstate transportation routes; 2) instrumentalities of commerce, such as "the people and things themselves moving in commerce, including automobiles, airplanes, boats, and shipments of goods"; and 3) those activities that substantially affect interstate commerce. *Id.* at 1225–26 (citing 514 U.S. at 558–59).

As the majority points out, the Court in *Ballinger* agreed that Congress has the power to prohibit the use of the instrumentalities of interstate commerce for "harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature." *Id.* at 1226. Congress can thus use this power to reach

4                CALVERT, J., Dissenting in Part                22-12792

intrastate acts "when the perpetrator uses the channels or instrumentalities of interstate commerce to facilitate their commission." *Id.* The Court concluded:

> Congress acted well within the bounds of its commerce power when it enacted legislation to prevent conduct like Ballinger's, which entailed weeks of travel in a van (an instrumentality of commerce) along interstate highways (a channel of commerce) and at least six separate interstate border crossings, all for the specific purpose of spreading the evil of church burning through four different states.

*Id.* at 1228.

The majority notes that *Ballinger* was explicit that a van there was an instrumentality of commerce. 395 F.3d at 1228. But the Court spent several pages discussing Ballinger crossing state lines and traveling on interstate highways, as well as considering the purpose of the arson statute and the change to the statute's jurisdictional elements after *Lopez*. *Ballinger*, 395 F.3d at 1227–40. The lengthy analysis is, at the very least, an indication that whether all automobiles are *per se* instrumentalities is not as straightforward an inquiry as the majority indicates.

After *Ballinger*, the Court next addressed the issue of automobiles as instrumentalities in *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1250 (11th Cir. 2008). In that case, the Court held that the Graves Amendment, a federal tort reform statute protecting rental car companies from certain suits, was

22-12792          CALVERT, J., Dissenting in Part          5

within Congress's power to regulate interstate commerce. *Id.* at 1252–53. One of the arguments advanced in support of the statute was that cars are *per se* instrumentalities of commerce; the Court noted competing views on the extent of the instrumentalities category:

> *Ballinger* arguably suggests, without explicitly stating, that persons and things moving in interstate commerce is the full extent of the instrumentalities category. But there is also some authority for the proposition that methods of interstate transportation and communication are per se instrumentalities of commerce, regardless of whether the car (or the like) at issue in a particular case has crossed state boundaries or is otherwise engaged in interstate commerce.

*Id.* at 1249. The Court then expressed doubts about cars always being instrumentalities of commerce—even when they are not used in interstate commerce—because it would give Congress plenary power over many aspects of automobile use typically left to the states. *Id.* at 1250.

The majority does not discuss *Garcia*, and admittedly *Garcia* does not rest its holding on whether cars are *per se* instrumentalities. But what it did hold was just as important as what it did not hold. The Court, in not deciding the question of whether cars are instrumentalities, avoided what it characterized as a difficult constitutional issue. *Id.*; *see Otto v. City of Boca Raton*, 981

F.3d 854, 871 (11th Cir. 2020) ("[F]ederal courts should 'avoid reaching constitutional questions if there are other grounds upon which a case can be decided.'") (quoting *BellSouth Telecomms., Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1176 (11th Cir. 2001)).

Here, we cannot avoid the constitutional issue because Travis's truck is the sole alleged basis for federal jurisdiction.[1] Even so, I do not read *Lopez* and *Ballinger* to support the categorical approach to instrumentalities the Seventh Circuit adopted in *United States v. Protho*, 41 F.4th 812, 828 (7th Cir. 2022) ("Instead, it's the *nature* of the regulated object's class (here, automobiles) rather than the particular use of one member of that class (Protho's Ford Explorer) that matters."). Instead, I agree with the Tenth Circuit's decision in *United States v. Chavarria*, 140 F.4th 1257, 1265 (10th Cir. 2025), which rejected *Protho* and held that motor vehicles are not *per se* instrumentalities.

In *Chavarria*, the Tenth Circuit explained that under longstanding Supreme Court precedent, something must "actually be put to the *end* of interstate commerce to be an *instrumentality* of

---

[1] That said, two of the circuit cases the majority relied on need not have reached the issue of whether automobiles are *per se* instrumentalities. *United States v. Protho*, 41 F.4th 812, 828–29 (7th Cir. 2022) ("Even if we were to accept Protho's legal argument, however, there's no doubt that the Ford Explorer at issue was used in interstate commerce. On the day of the kidnapping, Protho drove the Ford Explorer interstate (from his home in East Chicago, Indiana, to the site of the kidnapping in Calumet City, Illinois)."), *cert. denied*, 143 S. Ct. 465 (2022); *United States v. Windham*, 53 F.4th 1006, 1013 (6th Cir. 2022) ("This Court has held repeatedly and unambiguously that cars and phones are instrumentalities of interstate commerce.").

22-12792         CALVERT, J., Dissenting in Part         7

interstate commerce." *Id.* (citing *Gibbons v. Ogden*, 22 U.S. 1, 194 (1824)). "Certain items," that court explained, "by virtue of their class and with judicial economy in mind—permit the reasonable inference that they are per se instrumentalities of interstate commerce." *Id.* As the majority recognizes, railcars and airplanes generally qualify for this inference. And as the Tenth Circuit explained, "[t]he precise planning and careful coordination between the states required for air and rail traffic sets those modes of transportation apart as uniquely interstate." *Id.* at 1266. But the motor vehicles, including the automobile at issue in that case, can be used for all kinds of purely local activity. *Id.* ("We are convinced again by the lack of a limiting principle. Going on a picnic? Taking your child to school? Visiting a relative? Riding an ATV along a backwoods trail? Simply enjoying the open road?").[2]

Resisting the conclusion that the Commerce Clause reaches these types of activities, the Tenth Circuit synthesized commerce clause precedent to conclude that when motor vehicles are used only for non-commercial, intrastate purposes, without any other allegation of interstate commercial impact, "neither that employment, nor its regulation or prohibition, falls within the

---

[2] The majority distinguishes *Chavarria* by pointing out that the indictment in that case referred to a "motor vehicle," while the indictment here referred to a "truck." 140 F.4th at 1259. While *Chavarria* discussed the possibility that a "motor vehicle" could include "e-bikes," "[l]awnmowers," "[e]lectric scooters," "[e]levators," and "[m]otorized [w]heelchairs," *id.* at 1266, the motor vehicle in question in that case was a Jeep Cherokee Latitude, a compact SUV. *Id.* at 1259.

8                    CALVERT, J., Dissenting in Part                    22-12792

purview of the federal constitution." *Id.* at 1267 (quoting *Gibbons*, 22 U.S. at 94–95).

This holding aligns with the Court's analysis in *Ballinger*, and in my opinion, reflects the better approach. Employing this approach, I would utilize traditional tools of statutory interpretation, and consider whether the specific facts in an individual case align both with Congress's commerce power and Congress's purpose in enacting the specific legislation at issue. *See United States v. Bass*, 404 U.S. 336, 350 (1970) ("Absent proof of some interstate commerce nexus in *each* case, § 1202(a) dramatically intrudes upon traditional state criminal jurisdiction.") (emphasis added); *see also United States v. Bishop*, 66 F.3d 569, 578–80 (3d Cir. 1995) (relying on congressional findings when considering the constitutionality of the federal carjacking statute); *United States v. Oliver*, 60 F.3d 547, 550 (9th Cir. 1995) (same); *Perez v. United States*, 402 U.S. 146, 155–57 (1971) (relying on congressional findings on loan sharking).

A case-by-case approach is appropriate for two reasons. First, the Supreme Court has been hesitant "to render the 'traditionally local criminal conduct'" in which defendants engaged "a matter for federal enforcement." *Jones v. United States*, 529 U.S. 848, 858 (2000) (quoting *Bass,* 404 U.S. at 350); *see also id.* ("'[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes.") (quoting *Bass,* 404 U.S. at 349). Second, a categorical approach risks "obliterat[ing] the distinction between what is

22-12792            CALVERT, J., Dissenting in Part            9

national and what is local in the activities of commerce." *Lopez*, 514 U.S. 549, 567 (1995) (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 554 (1935)).[3] The *Garcia* Court provided examples of how a holding that cars are *per se* instrumentalities would vastly broaden federal power, noting that it could be read to embrace "regulation of such quintessentially state law matters as traffic rules and licensing drivers." 540 F.3d at 1250. Given these constitutional concerns, I cannot agree with the majority's holding that all automobiles are *per se* instrumentalities.

II.

Under a case-by-case approach informed by tools of statutory interpretation, it becomes clear that the defendants' attempted kidnapping convictions should be reversed. First, there is no indication that Congress intended to criminalize all kidnappings involving an automobile when it amended § 1201. *But see Bass*, 404 U.S. at 349 ("In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended

---

[3] I recognize that this Court has held that the internet and telephones are *per se* instrumentalities which subject wholly intrastate users to federal prosecution. *United States v. Faris*, 583 F.3d 756, 759 (11th Cir. 2009), *superseded on other grounds as stated in United States v. Jerchower*, 631 F.3d 1181, 1184 (11th Cir. 2010)). There are many sound reasons to treat these pieces of technology differently, including that they require existing interstate technological infrastructure to function. *See Chavarria*, 140 F.4th at 1265. In any case, we should be reluctant to expand the *per se* categories of instrumentalities subject to federal jurisdiction for the reasons I discuss elsewhere in this opinion.

to bring into issue, the critical matters involved in the judicial decision."). The element requiring that "the offender . . . uses . . . any . . . instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense" was added via the passage of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587, § 501. The legislative findings of that Act centered on a connection between the physical intrastate transfer of custody of children, the inherently interstate market for child sexual abuse material, and the use of instrumentalities of interstate commerce such as the internet. *Id.* With this context in mind, it is apparent that the defendants' use of a truck to chase and block Arbery does not align with Congress's intent when it added instrumentalities to § 1201.

That Congress did not consider automobiles to be *per se* instrumentalities can also be gleaned from the plain language of the statute. Prior to the 2006 amendment, federal jurisdiction for kidnapping existed when a "person is willfully transported in interstate or foreign commerce" or "the offender travels in interstate or foreign commerce." 18 U.S.C. § 1201(a)(1). Congress then added "or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce." *Id.* If Congress intended to federalize any kidnapping using an automobile, it could have simply struck "in interstate or foreign commerce," because under the majority's interpretation, all travel by automobile, train, or airplane, intrastate or interstate, is covered by the statute. We should assume that Congress intended each jurisdictional prong to mean something different. *Jones*, 529 U.S. at

22-12792          CALVERT, J., Dissenting in Part          11

857 ("Judges should hesitate . . . to treat statutory terms in any setting [as surplusage], and resistance should be heightened when the words describe an element of a criminal offense." (citing *Ratzlaf v. United States*, 510 U.S. 135, 140–41 (1994)); *see also Ballinger*, 395 F.3d at 1236 ("In addition to eviscerating the statute substantively, reading out 'in commerce' contravenes basic canons of statutory interpretation. For one, an interpretation that fails to give any meaning at all to the statute's 'in commerce' language violates a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (citations and quotations omitted). Thus, the plain language of the statute also undercuts the majority's conclusion that § 1201 covers defendants' intrastate use of a truck.

In addition to blurring the jurisdictional elements of § 1201, the majority's holding creates similar inconsistencies in other criminal statutes involving motor vehicles by rendering superfluous references to the vehicles being used or transported in commerce or across state lines. *See* 18 U.S.C. § 33 (tampering with motor vehicles "used, operated, or employed in interstate or foreign commerce"); 18 U.S.C. § 2119 (hijacking a "motor vehicle that has been transported, shipped, or received in interstate or foreign commerce"); 18 U.S.C. § 2312 (transporting stolen vehicles "in interstate or foreign commerce"); 18 U.S.C. § 2313 (sale or receipt of a motor vehicle "which has crossed a State or United States boundary after being stolen"); 18 U.S.C. § 2322 (defining "chop shops" to mean facilities where persons dismantle and

distribute vehicles or vehicle parts "in interstate or foreign commerce"); 18 U.S.C. § 3665 (judgment of conviction for "transporting a stolen motor vehicle in interstate or foreign commerce" may order confiscation and disposal of firearms). While Congress may mean different things when it regulates a vehicle "in commerce" and a vehicle "of commerce," there is no indication that Congress intended the kidnapping statute, which does not even mention motor vehicles, to regulate a broader class of automobiles than statutes that explicitly regulate and protect motor vehicles.

## III.

In conclusion, rather than a blanket rule for all automobiles, I would look at the specific use of the automobile and consider whether that use was consistent with the text of the statute, Congress's intent, and the limitations on Congress's ability to regulate commerce. Considering all of these factors, it is apparent that the defendants' use of a truck to drive and park on streets in a residential neighborhood was insufficient to confer jurisdiction under § 1201(a).[4]

---

[4] In a footnote, the majority finds that any error in the district court's admission of NICB records showing that Travis's truck was manufactured in the United States was harmless because automobiles are *per se* instrumentalities of commerce. I agree that admission of this evidence is harmless, but for a different reason: it is irrelevant to whether Travis's truck is an instrumentality of commerce.

22-12792          CALVERT, J., Dissenting in Part          13

I would reverse the defendants' kidnapping convictions and remand for resentencing. To the extent the majority holds otherwise, I respectfully dissent.